No. 100,475

STATE OF KANSAS, *Appellee*, v. SAMUEL M. BECKER, *Appellant*.

(235 P.3d 424)

Opinion filed July 9, 2010.

*Jessica R. Kunen*, of Lawrence, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, assistant solicitor general, argued the cause, and *Steve Six*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: From the evening of January 29, 2007, to the morning of January 30, 2007, three men engaged in a course of conduct that would take them across two Kansas towns and into the homes of several people, ultimately resulting in one death and multiple charges of kidnapping, assault, battery, and murder. One of those men, Samuel Becker, stood trial and takes the current appeal. He appeals from his convictions by a jury of one count of first-degree murder, four counts of kidnapping, one count of attempted kidnapping, two counts of aggravated battery, two counts of aggra-

vated assault, and one count of aggravated burglary. He complains on appeal of various trial errors, including the admission of hearsay testimony, misconduct by the prosecutor, failure by the prosecution to prove various parts of its case, and improper jury instructions. We find no error of such consequence as to require reversing any of his convictions.

On January 29, 2007, Edward Gordon discovered that someone had broken into his house in Baxter Springs and stolen a safe in which he kept money and a supply of drugs that he kept for sale. He called Geoffrey Haynes, who gave Gordon and Gordon's girlfriend, Chandra Dupree, a ride to Pittsburg. There they met Aaron Graham and the defendant Becker.

Gordon, Graham, and Becker discussed how to determine who had stolen the safe and how to retrieve it. The three picked up a handgun at Graham's father's house and then drove to the home of George Rantz in Riverton. When Rantz answered the door, the three forced their way into the house. They proceeded to interrogate him about the missing safe, during which Graham waved the gun in the air and Becker suggested that someone was going to pay for the theft with his life. Rantz told them he did not know about the safe, and Becker urged Gordon and Graham to "shoot the motherfucker" to make an example out of him. Rantz's girlfriend, Haley Watkins, said she was going to call the police, and the three intruders became calmer. Rantz then said he would go with them to find the thief, and they all went back to Haynes's car and proceeded to the home of Drew Thiele.

Gordon, Graham, and Becker forced their way into Thiele's house and began questioning him about the contents of the safe and where he had been that night. During this questioning, Becker hit Thiele in the face with his fist. They then knocked Thiel down, and Becker beat him while Gordon pointed the gun at him. During the beating, Becker shoved his thumb into Thiele's eye and choked him. They finally left Thiele on the floor, telling him not to call the police and that he should have the drugs and money available at 5 a.m. or they would kill him.

They dropped Dupree off and made several other stops before driving to Gordon's house. All five men—Gordon, Graham,

Becker, Haynes, and Rantz—went inside. Dupree showed up a short time later because she had forgotten her cell phone. Gordon then called Brad Ashe and asked him to come to his house. Ashe and his girlfriend, Natalie Stephens, came into the house, where Graham approached Stephens, demanding to know who she was and telling her to leave.

Inside the house, Graham and Becker shouted at and threatened Ashe and waved the gun around. They forced him to sit on the couch and asked him questions about the missing safe. After Ashe denied any knowledge about it, Becker began to punch him and hit him with his knee. Stephens returned to the house and sat behind the couch while the men beat and questioned Ashe. At one point, Graham put the gun in Ashe's mouth and threatened to shoot him.

Dupree attempted to leave the house, but Graham stopped her, telling her that she was "not fucking going anywhere" and that she had to go to the back bedroom, which she did out of fear for her safety. Graham then discovered Stephens behind the couch and directed her to sit next to Ashe on the couch. Graham held the gun to her head and asked Ashe whether Stephens's life was worth five thousand dollars.

Gordon, Graham, and Becker then sent Haynes, Rantz, and Stephens to the back bedroom with Dupree, and they complied because they were afraid and thought they had no reasonable choice in the matter. The three men continued to beat and question Ashe, who mentioned the name of J-Rich, a nickname for Jamey Richardson.

While subjecting Ashe to the interrogation and beatings, Gordon and Graham went back and forth between the living room, where Ashe was located and the bedroom, where Dupree, Rantz, Haynes, and Stephens were located, while Becker stayed with Ashe. They threatened their captives with the gun and told them that they would shoot anyone who tried to leave the room. When Gordon and Graham went to take the cell phones from the people in the bedroom, Becker wielded two hacksaws at Ashe and asked him, "Do you know what kind of sick motherfucker I am?"

Around that time, Jamey Richardson arrived at the front door, apparently in response to a call from Gordon. Gordon and Graham let him into the house, and Graham pointed the gun at him. The three men directed him to sit on the couch, where they ordered him to tell them where the missing safe and its contents were. Graham pointed the gun at Richardson, who attempted to knock it away. Richardson then grabbed the barrel of the gun and forced it up toward the ceiling as he tried to stand up. Gordon, Graham, and Becker acted in concert to physically force him back onto the couch.

Richardson then suggested that they all go talk to someone else and again got up from the couch. He got as far as the front door, although Graham continued to train the gun on him and Graham attempted to block his path. Richardson went outside, and Gordon, Graham, and Becker followed him.

Ashe, who remained in the house, heard people yelling outside, followed by a gunshot. He heard someone say, "I shot your boy," and then Gordon returned to the house, ran through the house, and then ran back outside. A few seconds later he heard a second gunshot. Gordon, Graham, and Becker came back inside and told everyone to leave the house. Everyone ran from the house, during which time Rantz and Haynes saw Becker holding the gun.

As they ran from the house, Richardson screamed for help, but no one stopped to give him aid. A bullet had struck him in the leg, severing two arteries and causing him to bleed to death shortly after he was shot. At around 2 a.m., police, responding to calls from neighbors, found Richardson dead in the driver's seat of his car.

The following day, Becker admitted to Graham's mother that he had shot Richardson. He told her that Richardson had somehow taken the gun, which fired, and Richardson said he had "shot your boy. The gun then somehow fell to the ground, and Becker, fearing that Graham had been shot and that he himself would be shot next, picked up the gun and shot Richardson in self-defense.

Becker was eventually charged with a number of felonies: one count of aggravated burglary for entering a structure with the intent to commit aggravated assault against George Rantz and/or Haley Watkins; one count of aggravated assault against George Rantz;

one count of kidnapping of George Rantz with the intent to injure or terrorize Rantz or Ashe or Richardson; one count of aggravated burglary for entering a structure with the intent to commit aggravated assault against Joseph Thiele; one count of aggravated battery against Thiele; one count of aggravated battery against Ashe; one count of aggravated assault against Natalie Stephens; one count of kidnapping of Natalie Stephens with the intent to injure or terrorize Stephens or Ashe or Richardson; one count of kidnapping of Chandra Dupree with the intent to injure or terrorize Dupree or Ashe or Richardson; one count of kidnapping of Richardson with the intent to injure or terrorize Richardson; one count of kidnapping of Ashe with the intent to injure or terrorize Ashe; and one count of first degree felony murder for the death of Richardson while Becker was kidnapping Stephens and/or Dupree and/or Richardson.

A jury found Becker not guilty of the first count—aggravated burglary of the residence of Rantz and/or Watkins. The jury found him guilty of the lesser offense of attempted kidnapping of Richardson and guilty of every other count as charged. The district court sentenced him to an aggregate term of life plus 68 months.

## ADMISSION OF HEARSAY EVIDENCE

Becker contends that a number of statements made out of court were erroneously admitted in violation of the prohibition against hearsay evidence. He also contends that the admission of the statements violated the Confrontation Clause of the United States Constitution.

K.S.A. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Evidence of an out-of-court statement that is not offered to prove the truth of the matter stated is not hearsay under K.S.A. 60-460. *Boldridge v. State*, 289 Kan. 618, Syl. ¶ 12, 215 P.3d 585 (2009). The theory behind the hearsay rule is that when a statement is offered as evidence of the truth of the matter stated, the credibility of the declarant is the basis for its reliability, and the declarant must therefore be subject to cross-examination. 289 Kan. at 634.

This court has identified a number of out-of-court statements that do not constitute hearsay under K.S.A. 60-460 because they were not used to prove the truth of the matter that the statements asserted. These include statements material as part of the issue of a case; statements comprising verbal parts of an act; statements used circumstantially to give rise to an indirect inference but not to prove the matter asserted; and statements tending to show the defendant's state of mind. 289 Kan. at 634. Statements offered into evidence not to prove the truth of the statement but "merely to show that the statements were said" or to show their effect on the listener accordingly do not constitute hearsay. *State v. Harris*, 259 Kan. 689, 699, 915 P.2d 758 (1996).

Becker presents a list of out-of-court statements that came before the jury through various witnesses. He complains that these statements constituted impermissible hearsay testimony and that a prosecution subterfuge deterred him from registering contemporaneous objections. The statements consisted, in the main, of threats to individuals, such as: "[T]hey shut the door and said if anybody comes out of here we're going to shoot them," and "They told me that they were going to be back at 5:00 a.m. and I better have drugs or money or they were going to kill me." The statements also included directives, such as Graham telling the captives in the bedroom that they needed to leave the bedroom door open and Graham and Gordon demanding that they surrender their cell phones.

These statements did not constitute hearsay because they were not presented to prove the truth of the assertions. It is irrelevant and unnecessary to know, for example, whether Graham and Gordon really would have shot anyone who attempted to leave the back bedroom while they interrogated Ashe and Richardson. The situation in this case is different from that in *Harris*, where the out-of-court threatening statement was offered to prove premeditation in the killing of the person about whom the threat was made. Here, the threats were offered as explanations for why the people who heard the threats responded as they did—staying in a room, for example, or leaving for another town.

Similarly, directives to stay in a certain place or to surrender cell phones were not susceptible to a determination of truthfulness by the jury. Directives are in the imperative mood, unlike statements of fact, which are in the indicative mood. See *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) (statements offered as evidence of commands or threats directed to the witness, rather than for the truth of the matter asserted, are not hearsay); *State v. Leonard*, 104 Ohio St. 3d 54, 71-72, 818 N.E.2d 229 (2004) (statements that cannot be true or false are not assertions and cannot be hearsay). Like the threats, these statements came into testimony in the course of explaining why other people engaged in certain conduct. A statement offered to prove the effect on the listener is admissible through the person who heard it. *State v. Patton*, 280 Kan. 146, 162, 120 P.3d 760 (2005).

We note that, although Becker did not make a contemporaneous objection to the admission of these statements, he had been led to believe that the State intended to call Gordon. Even though Gordon remained available for Becker to call as a witness, he was not available for cross-examination because the State ultimately elected not to put him on the stand. As the State conceded at oral argument, Gordon's presence would therefore not have shielded hearsay statements attributed to him. See *State v. Fisher*, 222 Kan. 76, 81-82, 563 P.2d 1012 (1977) (declarant must testify at trial before hearsay evidence may be admitted under statutory exception to hearsay rule for previous statement of person who is present and available for cross-examination with respect to that statement and its subject matter). We also note that the safer practice for defense counsel is to make a contemporaneous objection to the admission of hearsay testimony. See *Fisher*, 222 Kan. at 84 (failure to make timely, specific objections to testimony alleged to have been erroneously admitted bars appellate review of testimony).

Here, however, whether the State duped Becker into relying on Gordon's testimony in order to allow into evidence the out-of-court statements absent a contemporaneous objection bears no consequence. The out-of-court statements did not violate statutory prohibitions on hearsay testimony because they were not hearsay. These statements were made in the course of the criminal activity,

not in the course of the subsequent investigation. Because the statements were not testimonial, that is to say, they were not made in the reasonable expectation of eventual use in a criminal proceeding, the statements also did not violate the Sixth Amendment Confrontation Clause. See *State v. Davis*, 283 Kan. 569, 574-75, 158 P.3d 317 (2007) (nontestimonial evidence is examined in light of state hearsay statutes); see also *Crawford v. Washington*, 541 U.S. 36, 51-52, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004) (testimonial statements include statements made in circumstances that would cause objective witness to reasonably believe that the statement would be available for use in future criminal proceedings).

## PROSECUTORIAL MISCONDUCT

Becker contends that the prosecutor made statements relating to aiding and abetting that improperly changed the burden of proving intent. He alleges that these comments implied that mere presence at a criminal undertaking may suffice to establish guilt as an aider and abettor without demonstrating the same intent as the principals.

When a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of alleged errors is analyzed in the context of the trial record as a whole. *State v. Warledo*, 286 Kan. 927, 948, 190 P.3d 937 (2008).

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009). *McReynolds* sets out additional analytic steps for the court if it finds misconduct.

Becker complains about comments that the prosecutor made during the course of both voir dire and closing argument. During voir dire, the prosecutor informed the jury that it did not have to

find that Becker and his cohorts intended to kill Richardson but only that Richardson was killed during the course of their committing a felony.

Becker argues on appeal that this statement of the law was incorrect because the prosecutor failed to inform the jury that the State must prove intent to commit the underlying felonies. We find no reason, however, to create a requirement that a prosecutor must set out every element of every charged crime during voir dire. The prosecutor's general statement of the nature of the case was accurate.

Also during voir dire, the prosecutor told the jury that a person can be held responsible for the actions of another person:

"[I]n certain circumstances when a person can be held responsible for the actions of another person. And that's kind of where we get that in for a penny; you might as well bid a whole dollar. It's like being a little bit pregnant. Even if you're involved a little bit you're involved the whole way."

During closing argument, the prosecutor expanded on this theme:

"I'm a big high school wrestling fan. My son wrestles, I talk about it all the time. We were at a tournament up in Derby, Kansas, this weekend and the kids did pretty good; they won a trophy, a team trophy, and they placed. And at the end you know how these sports things do, the kids all gathered around the trophy and they were taking a picture. And a little 119 pounder, he was off to the side. The coach said, 'Chase, come on. Get over here. Get in the picture.' Chase said, 'Coach, I didn't have a good tournament. I'll just be back here.' He said, 'No you're a part of this team just like everybody else. You own as much of this trophy as anybody else.'

"Today we're here for a much different picture and we find the defendant wanting to step back, step out of the picture saying, I'm not part of that; that's somebody else.

"Ladies and gentlemen, today is the day that this defendant needs to step up; that he must step up and be held responsible. Today is the day that you tell him, you're a member of the team that did that. You own this picture. You are responsible for that."

He also stated:

"We talked in voir dire about the concept in for a penny and in for a pound. And we also talked about the fact that you can't be a little bit pregnant. And if you aid somebody, if you're an aider and abettor you can't be a little bit involved."

In addition, he stated:

"You can't be a little bit involved in a kidnapping. [If] [y]ou're involved, you're involved. If you're involved with the kidnapping you're guilty of felony murder."

Taken out of context, these comments may incorrectly suggest that intent to commit the crimes is not essential to proving guilt as an aider and abettor. In the context of his entire argument, however, the prosecutor clearly stated that intent was an essential element. The prosecutor made numerous references to the jury having to find intent. For example, the prosecutor said, "So each time you go to a different count you have to ask yourself did he aid and abet. And when you aid and abet you have to aid and abet with the intent to promote or assist in the commission of the crime. Later, the prosecutor said, "It doesn't matter if he was terrorized. What matters is if they intended to terrorize him. That was the whole plan; get these people over here, threaten them and find out where the safe is. So was there intent to terrorize him?"

The prosecutor's comments about aiding and abetting were not improper. They must be read in conjunction with the closing argument as a whole, which asserted the need to find intent on Becker's part, and in light of the evidence as a whole, which showed that Becker behaved much like a principal and engaged in conduct from which it could easily be inferred that he intended the elements of the crimes charged.

Because the prosecutor accurately stated the law, it is unnecessary to engage in the additional analysis set out in *McReynolds*. We find no error.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE KIDNAPPING AND FELONY-MURDER CONVICTIONS

Becker argues on appeal that he was convicted of aiding and abetting Gordon and Graham in the kidnappings and attempted kidnapping, but that the State failed to provide sufficient evidence to support a finding that he had the necessary intent to kidnap the five victims. Because kidnapping is a specific-intent crime, the State was required to prove that he had the same specific intent as the principals. A review of the evidence before the jury reveals that ample evidence existed showing that Becker acted as both a prin-

cipal and as an aider and abettor of the various kidnappings of which he was convicted.

When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009).

In order to obtain a conviction for kidnapping, the State must prove specific intent. See, *e.g.*, *State v. Wiggett*, 273 Kan. 438, Syl. ¶ 8, 44 P.3d 381 (2002). For a defendant to be convicted of a specific-intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal. *State v. Overstreet*, 288 Kan. 1, 13, 200 P.3d 427 (2009).

As Becker was charged and as the jury was instructed, the State had to prove not only that Becker had the general intent to take or confine a person by force, threat, or deception, but also that he had the specific intent to inflict bodily injury or to terrorize the victim or another. See K.S.A. 21-3420(c). The State was also required to prove that he intentionally aided or abetted another to commit the crime with the intent to promote or to assist in the commission of the crime. K.S.A. 21-3205(1); PIK Crim. 3d 54.05.

A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Scaife*, 286 Kan. 614, 618-19, 186 P.3d 755 (2008). Specific intent may be shown by acts, circumstances, and reasonable inferences deducible therefrom; it need not be shown by direct proof. *State v. Johnson*, 258 Kan. 61, 67, 899 P.2d 1050 (1995); *State v. Harper*, 235 Kan. 825, 828, 685 P.2d 850 (1984) (intent underlying entry into a building "is rarely susceptible of direct proof; it is usually inferred from the surrounding facts and circumstances").

The State argued that Becker was guilty of kidnapping Dupree, Rantz, and Stephens under a theory of aiding and abetting. This was not a case in which the defendant was sitting passively in the car waiting to drive the other perpetrators away; Becker was actively and violently engaged in the same enterprises as Gordon and

Graham. When the three went to the home of Rantz and Watkins, all three forced their way into the house, all three engaged in threatening Rantz, and Becker urged Graham to shoot Rantz. At Gordon's house, Rantz, Dupree, and Stephens were all sent to a back bedroom by Gordon, Graham, and Becker. There was abundant testimony that all three of the men took part in beating and threatening Ashe and forcing him to stay on the couch. There was also abundant testimony that Becker stood guard over Ashe while Gordon and Graham went to the bedroom, threatened the captives there with the gun, and took their cell phones. A jury could easily conclude that Becker acted in concert with Gordon and Graham to carry out the kidnapping of Dupree, Stephens, and Richardson. In fact, it would have taken a remarkable leap of logic for a jury to conclude that Becker did not intend to participate fully in all of the criminal acts, up to and including the shooting.

Becker also contends that insufficient evidence supported a claim that the kidnappings of Stephens and Dupree and the attempted kidnapping of Richardson were carried out with the intent to terrorize or to inflict bodily injury on Ashe or Richardson. The three victims in the bedroom were kept there and deprived of their cell phones while first Ashe and then Richardson were threatened and beaten. A jury could reasonably conclude that the purpose of isolating them was to prevent them from aiding Ashe and Richardson, to prevent them from calling for help for Ashe and Richardson, and to reduce the likelihood that they would witness the harm and threats inflicted on Ashe and Richardson.

Finally, Becker maintains that no separate harm was done to Ashe and Richardson while they were held captive beyond the terror and threats used to keep them restrained. Becker argues that the same terror could not be used as the means of restraint and the objective of the kidnapping. In the case of Ashe, however, there were not only threats and the showing of a gun and handsaws, there was also repeated violent beating in the course of interrogating him about the missing safe. In the case of Richardson, there was both the physical restraint demonstrated by the three men tackling him and pushing him onto the couch and the terror intended by holding a gun to his head while asking him about the

safe. Although the elements of forcible restraint and intent to terrorize and do harm overlapped, they were not redundant, and different facts could be used to demonstrate different elements of the offenses.

Because the State offered more than adequate evidence supporting the kidnapping convictions, Becker's challenge to the felony-murder conviction based on the sufficiency of the evidence also fails.

### FAILURE TO GIVE A UNANIMITY INSTRUCTION

The jury was instructed that, in order to find Becker guilty of felony murder, the State had to prove that Richardson was killed while in the commission of the kidnapping of Stephens and/or the kidnapping of Dupree and/or Richardson. Becker did not request a specific unanimity instruction. Becker now contends on appeal that allowing the jury to convict him of felony murder based on three alternative underlying felonies, without requiring the jury to specify on which felony it relied, denied him a unanimous verdict.

In the absence of a requested unanimity instruction, an appellate court reviews for error under the clearly erroneous standard. *State v. Foster*, 2010 WL 2331156, at *3 (Kan. 2010); *State v. Voyles*, 284 Kan. 239, Syl. ¶ 4, 160 P.3d 794 (2007). We will find instructions to be clearly erroneous only if we are firmly convinced that there is a real possibility the jury would have rendered a different verdict had the trial error not occurred. *State v. Carter*, 284 Kan. 312, 324, 160 P.3d 457 (2007).

Becker contends that this is a multiple acts case—the three kidnappings constituted multiple acts, each one requiring unanimity by the jury as to guilt. The State counters that this is an alternative means case—that any of the three kidnappings or the kidnappings in combination could provide a basis for the felony murder.

Alternative means and multiple acts cases are distinguished as follows:

" 'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.

[Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]

" 'In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt. [Citations omitted.]' [*State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 (1988)]." *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994).

This case involved alternative means. A single offense was committed—the unlawful shooting of Richardson—which could have been committed in more than one way. In an alternative means case the jury must be unanimous as to guilt for the single crime charged, but need not be unanimous as to the particular means by which the crime was committed, so long as substantial evidence supports each alternative means. *State v. Wright*, 290 Kan. 194, 201-07, 224 P.3d 1159, 1164 (2010). It is for this court to determine on review whether each of the means presented—three different kidnappings or attempted kidnappings—could, as a matter of law, have been accepted by the jury as proven beyond a reasonable doubt.

On the sufficiency of evidence point, Becker argues that the prosecution's case hit a stumbling block because of the completion of the acts of kidnapping. He contends that Richardson got off the couch after being forced to sit down and the kidnapping attempt was completed at that time. He further contends that the shooting of Richardson was in no way causally connected to the kidnappings of Dupree and Stephens. In other words, because all or part of the jury could have relied on a felony with an inadequate connection to the murder, Becker asserts he is entitled to reversal.

Acceptance of this argument requires an impossible stretch of the imagination. The four people in the back bedroom were being held there in part so that Becker and the others could terrorize and beat Ashe and then Richardson. The kidnappings and the murder were closely related. Although Richardson got up to leave the

house, the perpetrators attempted to stop him, and it was as he was attempting to escape his captivity that he was shot. We cannot conclude that the attempted kidnapping of Richardson was completed by that time.

It is not, however, necessary to engage in speculation about whether the jury properly considered the causal link between the kidnappings and the shooting. The jury was instructed that, in order to find Becker guilty of felony murder, it would have to find that the shooting "was done while in the commission of" the kidnappings. Appellate courts presume that a jury followed the jury instructions. *City of Mission Hills v. Sexton*, 284 Kan. 414, 438, 160 P.3d 812 (2007). In essence, Becker urges this court to speculate that the jury did not follow the instruction; that it instead ignored the "while in the commission of" language and possibly determined that the kidnappings were already completed and thus unrelated to the shooting. This speculation is particularly unwarranted, given the great weight of evidence against Becker that was presented at the trial.

We find there was no error in the failure to give a specific unanimity instruction.

### FAILURE TO GIVE AN UNINTENTIONAL SECOND-DEGREE MURDER INSTRUCTION

The district court instructed the jury on felony murder, intentional second-degree murder, and involuntary manslaughter. Becker contends on appeal that the trial court erred by failing to give an instruction on the lesser included offense of unintentional second-degree murder. He did not object at trial to the lack of that instruction, and he did not propose the instruction.

An appellate court reviewing a district court's failure to give a particular instruction applies a clearly erroneous standard where a party neither suggested an instruction nor objected to its omission. *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006); see K.S.A. 22-3414(3).

"When a murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is tantamount to the elements of deliberation and premeditation that are

otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required." *State v. Hoffman*, 288 Kan. 100, Syl. ¶ 4, 200 P.3d 1254 (2009).

The State relied on three kidnapping counts to establish the felonies underlying the felony-murder count. Becker argues that the evidence supporting the kidnappings was weak, inconclusive, or conflicting. The analysis of whether the evidence supported the kidnapping counts returns to the argument Becker raised in his third issue. As we discussed above, the evidence supporting the kidnappings was strong and conclusive.

The jury found that Becker killed Richardson while committing an inherently dangerous felony. It would not matter whether the jury believed the killing was intentional or merely reckless or even committed in attempting to protect himself. In order to find the possibility that the jury might have convicted under a theory of unintentional second-degree murder, this court would have to find that the jury improperly convicted Becker under the three kidnapping counts. We refuse to make such a finding.

The conviction is affirmed.

\* \* \*

JOHNSON, J., concurring: I concur in the result, including the determination that it was not clearly erroneous for the trial court to fail to give a lesser included offense instruction on unintentional second-degree murder. I write separately to reiterate my disagreement with the court-made special rule for lesser included instructions in felony-murder cases. See *State v. Jones*, 287 Kan. 547, 558, 198 P.3d 756 (2008) (Johnson, J., concurring).