(288 P.3d 504)
No. 106,083

STATE OF KANSAS, *Appellee*, v. TOMMY RAY JAMES, *Appellant*.

Opinion filed November 9, 2012.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Stephen Hunting*, county attorney, *Heather R. Jones*, former county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., PIERRON and MARQUARDT, JJ.

BRUNS, J.: A jury convicted Tommy Ray James of possession of marijuana with the intent to sell, possession of marijuana without a tax stamp, possession with the intent to use drug paraphernalia, transporting an open container, and faulty equipment. Prior to trial, James had pled no contest to an ignition interlock violation. The district court sentenced James to 44 months in the custody of the Secretary of Corrections but granted him a durational departure for a total term of 30 months. On appeal, we find no constitutional violations, no reversible error committed by the district court, and no prosecutorial misconduct. Thus, we affirm.

## FACTS

On the night of December 10, 2009, Master Deputy Mike Voigts was patrolling a section of Interstate 35 in Franklin County. As he drove his patrol car southbound, Deputy Voigts saw an SUV travelling northbound with one headlight out. Deputy Voigts turned his patrol car around and initiated a traffic stop. In doing so, the deputy noticed that a male was in the driver's seat and that a female was in the passenger seat.

Deputy Voigts approached the vehicle and told the driver that one of his headlights was out. Immediately, the deputy smelled the

odor of alcohol coming from the SUV. The driver got out of the SUV, although Deputy Voigts never made the request, to check his headlight. While outside the vehicle, Deputy Voigts noticed that the driver's breath also smelled of alcohol.

Once the driver had confirmed that his headlight was out, Deputy Voigts requested his driver's license and proof of insurance. The deputy identified the driver as James and also determined that James was the owner of the SUV. Because James did not have proof of insurance with him, he stepped to the back of the SUV and made a call on his cell phone to a person he said was his girlfriend to try to obtain his insurance information.

After James finished his cell phone conversation, Deputy Voigts asked him if he had been drinking alcohol. James initially denied that he had been drinking, but he told the deputy that his passenger had been doing so. When Deputy Voigts told James that he could still smell the odor of alcohol when he was talking to him, James admitted that he had drunk one or two drinks in Emporia earlier in the evening.

With James standing at the back of the SUV, Deputy Voigts went to talk to the passenger and asked her to get out of the vehicle. When she did so, the interior light of the SUV came on and the deputy noticed what appeared to be a less-than-full bottle of alcohol on the floor behind the driver's seat. Deputy Voigts then returned to James to ask him about the bottle.

After James admitted that he knew the bottle was in his SUV, Deputy Voigts placed him in handcuffs and advised him of his *Miranda* rights. James agreed to talk to the deputy and said he had purchased the alcohol in Emporia. Although James initially said there was nothing else illegal in the SUV, he later admitted that there were paper cups in the cup holders near the SUV's center console that contained mixed drinks. James also admitted that he and his passenger had been sipping on the mixed drinks on the way back from Emporia. Based on this information, Deputy Voigts returned to the SUV to search for additional evidence.

Upon opening the glove box of James' SUV, Deputy Voigts found a large plastic bag containing green vegetation that he believed to be marijuana. The plastic bag was sitting on top of some

papers and other things in the glove box. The Kansas Bureau of Investigation later determined that the plastic bag contained 221.59 grams—or approximately a half pound—of marijuana. Although Deputy Voigts did not smell marijuana prior to opening the glove box, he observed two air fresheners hanging from the SUV's rearview mirror.

After finding the large plastic bag of marijuana in the glove box, Deputy Voigts also advised the passenger of her *Miranda* rights. The passenger agreed to speak with the deputy and denied that the marijuana belonged to her. She also told Deputy Voigts that she had ridden with James to Wichita and that she did not know there was marijuana in the SUV's glove box.

Deputy Voigts returned to James—who was standing in front of the deputy's patrol car—and told him that he found what appeared to be a half pound of marijuana in the glove box of the SUV. Further, Deputy Voigts reminded James of his *Miranda* rights before asking him questions about the marijuana. Although James told the deputy that he did not know anything about marijuana, he suggested that his brother may have left the marijuana in his SUV. When Deputy Voigts pointed out that he found the marijuana in the glove box located near where the passenger was sitting, James stated—on more than one occasion—that it was his vehicle and that he would take responsibility.

Shortly thereafter, James once again told Deputy Voigts that the marijuana might belong to his brother. James, who was still in handcuffs, suggested that he could call his brother. Although James told Deputy Voigts that he did not know his brother's phone number, he said that he was "pretty sure" the number was in his cell phone. He then stuck out his hip so Deputy Voigts could retrieve the cell phone from his pants pocket. While removing the cell phone from James' pocket, the deputy asked "are there going to be any text messages on here relating to drug sales?" And James responded that there was nothing about drugs on his phone.

Deputy Voigts proceeded to look at the cell phone in James' presence. In scrolling through James' text messages, the deputy found two incoming messages that caught his attention. On December 8, 2009, a person named Ash sent a text message to James'

cell phone, which read: "U got green I will meet U somewhere." Another text message, sent on December 9, 2009, said, "Hey T-Ray this is Cotie. U got a 20?"

At no point did James tell Deputy Voigts he could not search the text messages on his phone, and it appears from the video tape that the deputy did not have to use a password to gain access to the text messages. When asked about the text messages, James denied having any knowledge of them. James then asked Deputy Voigts what was going to happen to his SUV, and the deputy responded that it depended upon whether he found "scales or anything like that" in the vehicle.

Deputy Voigts then returned to James' SUV to search for evidence relating to the marijuana. Upon looking under some papers in the glove box where he had found the marijuana, the deputy discovered mechanical scales. As Deputy Voigts walked back towards his patrol car, James asked if he was "finding any scales," and the deputy said, "Yeah, right there." The deputy also told James that he found the scales in the "same place as where the marijuana was" discovered. When asked about the scales, James told Deputy Voigts they were a "hood ornament."

The State filed a complaint against James on December 29, 2009. James was charged with possession of marijuana with intent to sell or distribute, unlawfully arranging sales or purchases of controlled substances using a communication device, felony possession of drug paraphernalia, and various other offenses. On June 1, 2010, James filed a motion to suppress the evidence seized during the traffic stop.

An evidentiary hearing was held on June 29, 2010, at which both Deputy Voigts and James testified. In addition, a video tape of the traffic stop was presented. After considering the evidence, the district court denied the motion to suppress. Thereafter, on July 22, 2010, the district court memorialized its decision in a journal entry.

On July 26, 2010, the State filed an amended complaint against James. At the same time, the State filed a bill of particulars and a motion to admit the text messages into evidence at trial. In his response, James argued that the text messages were inadmissible hearsay and, in the alternative, that they constituted evidence of

prior bad acts subject to the limitations set forth in K.S.A. 60-455. In reply, the State argued that in the event the district court found the text messages constituted prior bad acts, they would be admissible under K.S.A. 60-455 to establish knowledge, motive, intent, plan, and identity.

The district court held a non-evidentiary hearing on October 18, 2010. At the hearing, counsel made oral arguments and responded to questions relating to the text messages and to the charge of unlawfully arranging sales or purchases of controlled substances using a communication device. In a later hearing, the district court announced that it was granting James' motion to dismiss the charge of unlawfully arranging sales or purchases of controlled substances using a communication device. Additionally, the district court announced that it found the evidence concerning the text messages to be admissible at trial—subject to a limiting instruction—to show that James had knowledge of the marijuana and the intent to sell or distribute.

A 2-day jury trial began on November 16, 2010. At trial, Deputy Voigts testified about the events on the night of December 10, 2009. In addition, a video of the traffic stop was admitted into evidence without objection and was shown to the jury. Although James objected to both the admission of Deputy Voigts' testimony regarding the text messages and his opinion testimony as to the meaning of certain terms used in the text messages, the district court overruled these objections.

Regarding the text messages, Deputy Voigts testified that based on his experience in investigating drug crimes, the word "green" is often used to refer to marijuana and the number "20" is often used to refer to $20 worth of drugs. The deputy also testified that one of the text messages was addressed to "T-Ray" and that James' full name is Tommy Ray James. Deputy Voigts further testified that although the specific amount may differ, $20 worth of marijuana would normally be less than an ounce. Moreover, the deputy testified that the scales found near the bag of marijuana in James' glove box were capable of measuring from 0 to 4 ounces.

Angelo Madrid took the witness stand as part of James' defense. After Madrid was advised of his constitutional rights outside the

presence of the jury, he testified that he had put the marijuana in James' glove box. Specifically, Madrid—who is a shade tree mechanic—testified that he had taken the marijuana as collateral for some work he did on another person's car. According to Madrid, he borrowed James' SUV, stuck the bag of marijuana in James' glove box, and forgot that it was there until after James' arrest. But Madrid testified that he did not know anything about the scales Deputy Voigts also found in the glove box. Moreover, Madrid testified that he knew Ash and Cotie—the names under which the text messages found on James' cell phone were sent—but he did not recall ever borrowing a cell phone from James.

Furthermore, James testified on his own behalf at trial. According to James, he and his passenger drove from Olathe to Wichita on December 10, 2009, to buy a $40 jewelry box from the home of a friend he called "V" or Vincent. But James admitted that he never told his passenger that he was going to Wichita to pick up a jewelry box. He also could not describe where Vincent lived other than on the west side of Wichita.

James testified that he initially thought Officer Voigts had placed the marijuana in his glove box or that it possibly belonged to his brother who lives in Wichita. Although James admitted that he had told Officer Voigts on the night of the traffic stop that he would take responsibility for the marijuana found in his SUV, he testified that he did so because he "knew for a fact" that his passenger had not put the marijuana in his SUV. He also admitted that he initially told Officer Voigts that he had not been drinking alcohol.

James described his relationship with Madrid to be that of "good friends," and he testified that Madrid had borrowed his SUV about a week prior to the traffic stop. According to James, he had not driven the SUV from the time Madrid returned it until the day he drove to Wichita to pick up the jewelry box because gas was too expensive. James further testified that after he was released from jail, he called several people—including Madrid—to find out whether any of them knew anything about the marijuana found in his SUV. James indicated that it was during one such call that Madrid told him that he had put the marijuana in the SUV's glove box.

Regarding the scales, which were admitted into evidence at trial, James testified that he was a diabetic and that a friend gave him the scales to weigh food. James also testified that after he found out that the scales were the wrong size to weigh food, he hung them from the rearview mirror of his SUV as an ornament. According to James, he did not know how the scales ended up in his glove box near the bag of marijuana.

James testified that he let a lot of people borrow his cell phone because people where he lived—which was in Olathe—did not have access to phones. Additionally, James testified that he did not read the text messages on his cell phone, nor does he even know how to text. When asked if he had ever been called T-Ray before, James stated that he had "been called a lot of things." And when asked if he had ever loaned his cell phone to someone named T-Ray, James responded that he was "pretty sure" he had but could not name anyone specifically who went by that name.

After weighing the evidence, the jury found James to be guilty of possession of marijuana with the intent to distribute, possession with the intent to use drug paraphernalia, possession of marijuana without a tax stamp, transporting alcohol in an open container, and operating a motor vehicle with defective equipment. James was also convicted of an ignition interlock device violation as a result of a no contest plea entered prior to trial. Although the court initially sentenced James to 44 months in custody of the Secretary of Corrections, it granted him a durational departure for a total term of 30 months. Subsequently, James filed a timely notice of appeal.

## ANALYSIS

### Issues Presented

On appeal, James presents six issues. First, whether the warrantless search of text messages on his cell phone violated his rights under the Fourth Amendment to the United States Constitution. Second, whether the district court erred by admitting evidence at trial of two text messages found on his cell phone. Third, whether it was error for the district court to permit a law enforcement officer to render opinions at trial regarding the meaning of certain terms used in the text messages. Fourth, whether the prosecutor

committed misconduct during the rebuttal portion of closing argument. Fifth, whether there was sufficient evidence presented at trial to establish beyond a reasonable doubt that James knew the marijuana was in the glove box of his SUV. Sixth, whether the district court committed cumulative error.

## Search of Text Messages Incident to Lawful Arrest

James contends that Deputy Voigts violated his constitutional rights under the Fourth Amendment to the United States Constitution by searching the text messages on his cell phone without a warrant. In response, the State contends that the search of the text messages for evidence associated with the discovery of the large bag of marijuana found in James' SUV was part of a valid search incident to arrest. It appears that neither the United States Supreme Court nor the Kansas Supreme Court has directly addressed this issue.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Generally, a warrantless search is unreasonable. See *State v. Daniel,* 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 563 U.S. 945 (2011). In Kansas, the recognized exceptions to the warrant requirement include—but are not limited to—consent, search incident to a lawful arrest, stop and frisk, probable cause plus exigent circumstances, the emergency doctrine, the plain view doctrine, and inventory searches. See *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012). In the present case, the district court found that the search of James' text messages was a valid search incident to arrest.

The United States Supreme Court has held that the scope of a search incident to a lawful arrest extends to containers found on an arrestee's person. *United States v. Robinson,* 414 U.S. 218, 236, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). In *Robinson,* the Supreme Court found that a law enforcement officer had the right to inspect a cigarette package found on an arrestee's person incident to a lawful arrest. 414 U.S. at 236. In reaching this decision, the *Robinson* court found:

"A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the

Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm or to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. *A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable' search under that Amendment."* (Emphasis added.) 414 U.S. at 235.

The *Robinson* court also found:

"Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the law enforcement officer] did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed. Having in the course of a lawful search come upon [a] crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct. [Citations omitted.]" 414 U.S. at 236.

In *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), the United States Supreme Court found the search of the defendant's car incident to his lawful arrest to be unconstitutional because the car was no longer in his immediate presence when police detained him. *Gant* returned to the rule articulated in *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), which permits a search incident to a lawful arrest of the arrestee's person and areas within the arrestee's immediate presence from which he or she might gain possession of a weapon or destructible evidence. *Gant*, 556 U.S. at 339; see also *State v. Henning*, 289 Kan. 136, 147, 209 P.3d 711 (2009). Although *Gant* addresses the issue of whether a motor vehicle outside an arrestee's immediate presence can be searched incident to a lawful arrest, we find nothing in the opinion that indicates the United States Supreme Court is backing away from its holding in *Robinson*, which allows law enforcement officers to look in containers found on a person incident to a lawful arrest.

Furthermore, our review of opinions from various jurisdictions reveals that the weight of authority applies *Robinson* to cases involving the search of a cell phone—including the viewing of text messages—seized from an arrestee incident to arrest. See *United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009) (Law enforcement officers may search "text messages and other information from cell phones and pagers seized incident to an arrest."); *Silvan v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009) ("[T]he permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person."); *Finley*, 477 F.3d at 259-60 (A law enforcement officer was "permitted to search [the defendant's] cell phone pursuant to his arrest."); *United States v. Gomez*, 807 F. Supp. 2d 1134, 1143 (S.D. Fla. 2011) (Law enforcement officers, "while at the scene of the arrest, had no need to obtain either Defendant's consent, or a warrant, before searching the cell phone's call log history."); *United States v. Davis*, 787 F. Supp. 2d 1165, 1170 (D. Or. 2011) ("Courts have generally permitted law enforcement officers to conduct warrantless searches of cell phones in cases involving drug-trafficking, where evidence of the crime is likely stored on the phones."); *United States v. Wurie*, 612 F. Supp. 2d 104, 110 (D. Mass. 2009) (There is "no principled basis for distinguishing a warrantless search of a cell phone from the search of other types of personal containers found on a defendant's person."); *People v. Diaz*, 51 Cal. 4th 84, 93, 119 Cal. Rptr. 3d 105, 244 P.3d 501 (2011) ("We hold that the cell phone was 'immediately associated with [the defendant's] person,' and that the warrantless search of the cell phone therefore was valid."). See generally *Validity of Search of Wireless Communication Devices*, 62 A.L.R. 6th 161, § 6.

We recognize that there are jurisdictions that have found searches of cell phones incident to arrest to be illegal. See *Schlossberg v. Solesbee*, 844 F. Supp. 2d 1165, 1171 (D. Or. 2012); *State v. Smith*, 124 Ohio St. 3d 163, 170-71, 920 N.E.2d 949 (2009); *United States v. Park*, No. CR 05-375 SI, 2007 WL 1521573, at *9 (N.D. Cal. 2007) (unpublished opinion). See generally Annot., 62 A.L.R. 6th 161, § 7. But we note that in the relatively few cases that have determined a cell phone search incident to arrest to be

unreasonable, often the basis for this conclusion was not specific to cell phones. For example, there was no probable cause for arrest in the first place, the search of the cell phone was not contemporaneous to the arrest, or it was unlikely that the cell phone would contain any evidence of the crime. See, *e.g. United States v. Quintana*, 594 F. Supp. 2d 1291, 1299-1300 (M.D. Fla. 2009); *United States v. Lasalle*, No. 07-00032, 2007 WL 1390820, at *6 (D. Haw. 2007) (unpublished opinion); *United States v. Carter*, No. CRIM.A. 04-10099-GAO, 2006 WL 314345, at *5 (D. Mass. 2006) (unpublished opinion).

Here, James relies primarily on *State v. Smith*, 124 Ohio St. 3d 163, 170, 920 N.E.2d 949 (2009). In *Smith*, a divided Ohio Supreme Court held that a warrant was necessary to search a defendant's cell phone because a cell phone is not a container "capable of holding other physical objects." 124 Ohio St. 3d at 167. We do not necessarily agree with the premise that the information kept on a cell phone should be treated differently than information written on a piece of paper found on an arrestee's person. We also find *Smith* to be significantly distinguishable from the present case because—unlike the present case—the law enforcement officers completed at least a portion of the search of the cell phone after they had returned to the police station and were booking items seized at the crime scene into evidence. 124 Ohio St. 3d at 164.

James also relies on *State v. Rupnick*, 280 Kan. 720, 732, 125 P.3d 541 (2005), to argue that because smart phones can contain large amounts of personal data, courts should treat them like computer hard drives, which are generally searchable only with a warrant. Unfortunately, we cannot tell from the record whether James' cell phone was a smart phone. In fact, it appears from the video tape of the traffic stop that it was probably an older version flip phone and that the text messages were not protected by a user password. Regardless, we find that *Rupnick* merely stands for the proposition that computer hard drives are not searchable without a warrant *unless* an exception applies. 280 Kan. at 729; see also *State v. Isaac*, No. 101,230, 2009 WL 1858754, at *4 (Kan. App. 2009) (unpublished opinion).

The issue in dispute is not whether an individual has a reasonable expectation of privacy in the text messages found on his or her cell phone. See *Ontario v. Quon,* 560 U.S. 746, 130 S. Ct. 2619, 2630, 177 L. Ed. 2d 216 (2010) (discussing expectations of privacy persons may have in data contained in cell phones). Likewise, the issue in this case does not involve the recovery of sophisticated data from a cell phone. Rather, the issue presented is whether the scope of a search incident to a lawful arrest includes text messages contained in cell phones found on an arrestee's person.

We recognize that many cell phones, tablets, and similar electronic devices are capable of storing a wealth of personal information. But we find that the Fourth Amendment and the exceptions to the warrant requirement adequately protect such information from unreasonable search and seizure. See *Gomez,* 807 F. Supp. 2d at 1150 ("[T]he solution does not lie with a revamped analysis of the search incident to arrest doctrine."). Accordingly, we conclude that as part of a search incident to arrest, it is reasonable for a law enforcement officer to view the text messages contained in a cell phone found on an arrestee's person for evidence probative of criminal conduct.

It is important to recognize that James does not challenge the search of the SUV that led to the discovery of the marijuana in his glove box. Moreover, he does not challenge the legality of his arrest. Likewise, although James' counsel briefly mentioned during oral argument that the crime of arrest was transporting an open container rather than a drug crime, this issue is not addressed in his brief. As such, we need not consider the issue. See *State v. McCaslin,* 291 Kan. 697, 709, 245 P.3d 1030 (2011) (An issue not briefed by the appellant is deemed waived and abandoned.).

A review of the record reveals that after Deputy Voigts found the large bag of marijuana in James' glove box, the deputy notified James of this discovery. He also appropriately reminded James of his *Miranda* rights prior to questioning him about the marijuana or searching his cell phone. Further, it is undisputed that the cell phone was in James' pocket at the time of his arrest and that Deputy Voigts searched the text messages at the scene of the traffic stop in James' presence.

We, therefore, conclude that under the circumstances present, Deputy Voigts' inspection of the text messages on James' cell phone was a valid search incident to a lawful arrest. Furthermore, because we conclude that the search of the text messages was a valid search incident to arrest, we need not consider the State's additional argument that the search was consensual.

*Text Messages Were Not Hearsay*

James contends that even if the search of the cell phone was valid, the text messages on his phone were inadmissible hearsay. As such, James argues that the district court erred in admitting them into evidence at trial. We review a district court's decision to admit or exclude evidence pursuant to K.S.A. 60-460 under an abuse of discretion standard. But to the extent that an evidentiary issue involves the interpretation of a statute, our review is unlimited. See *State v. Miller*, 42 Kan. App. 2d 12, 21-22, 208 P.3d 774 (2009), *aff'd* 293 Kan. 535, 264 P.3d 461 (2011).

According to K.S.A. 60-460, inadmissible hearsay is a statement made other than by a witness testifying at the hearing that is "offered to prove the truth of the matter stated." If a party offers a statement for reasons other than to prove the truth of the matter stated, then the statement is not hearsay and it is admissible like any other relevant evidence. *State v. Becker*, 290 Kan. 842, 846, 235 P.3d 424 (2010). Likewise, "[s]tatements used circumstantially to give rise to an indirect inference but not to prove the matter asserted" are not hearsay. 290 Kan. at 847. Additionally, statements that can be neither true nor false are not hearsay. 290 Kan. at 848.

Here, Deputy Voigts found two text messages on James' cell phone. One said, "U got green I will meet U somewhere," and the other said, "Hey T-Ray this is Cotie, U got a 20?" We find these statements to be neither true nor false. Although we recognize that there may be instances in which an assertion is made in the form of a question, we do not find that the text messages in the present case constitute assertions. Rather, they were simply questions asking James whether or not he had had any "green"—which Deputy Voigts testified referred to marijuana—and whether or not he had "a 20"—which the deputy testified referred to $20 worth of drugs.

Accordingly, we conclude that the two text messages found on James' cell phone do not constitute hearsay.

*Opinion Testimony Regarding Meaning of Text Messages*

James contends that the district court erred by admitting Deputy Voigts' opinon regarding the meaning of certain words used in the text messages found on his cell phone. Specifically, James argues that the district court failed to make an express finding that Deputy Voigts was a qualified expert pursuant to K.S.A. 60-456. We review the district court's admission of expert testimony for abuse of discretion. See *State v. Johnson*, 286 Kan. 824, 831, 190 P.3d 207 (2008). Additionally, we have unlimited review over the interpretation of statutes. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

Before a witness can render an expert opinion, the district court must find that the opinion is "(1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(b). But K.S.A. 60-456(c) provides that "[u]nless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission." As such, when opinion testimony is admitted by the district court, a finding supporting its admission is implied. See *State v. McConnell*, 9 Kan. App. 2d 688, 692, 688 P.2d 1224 (1984); *State v. Humbolt*, 1 Kan. App. 2d 137, 562 P.2d 123 (1977). Thus, we conclude that James' argument regarding the district court's failure to make a required finding is without merit.

James also argues that the State failed to establish that Deputy Voigts had sufficient experience to render an opinion about the meaning of "drug jargon" or code words used by those involved in the sale of drugs to conceal the nature of their activities. A review of the record, however, reveals that Deputy Voigts was a 13-year veteran law enforcement officer and a member of the canine narcotics unit. He testified that he was certified every year in the detection of narcotics with canine assistance and without. On the job, he investigated drug crimes on a weekly basis. Moreover, Deputy Voigts testified that through his many narcotics investigations,

he had experience dealing with coded text messages relating to drug activity. Consequently, we find that the State laid the proper experiential foundation for Deputy Voigts' opinion testimony.

Based on *United States v. Wilson*, 484 F.3d 267, 275 (4th Cir. 2007), James argues that the district court erred by not requiring Deputy Voigts to describe to the jury the methodology he used to decipher the two coded text messages. But *Wilson* dealt with an extensive wiretap recording that involved complex coded communications. 484 F.3d at 273-78. Here, Officer Voigts' opinion testimony simply involved the meaning of only one word and one number, "green" and "20." Because the drug jargon was not complex and Deputy Voigts based his opinion on his training and experience dealing with the language those involved in drug activities often use, we find that there was no need for the deputy to explain the methodology to the jury.

We pause to note that even if Deputy Voigts was not qualified to serve as an expert witness, his opinions regarding the meaning of the word "green" and the number "20" as used in the text messages would have been admissible as a lay opinion under K.S.A. 60-456(a). In *State v. McGraw*, 19 Kan. App. 2d 1001, 879 P.2d 1147 (1994), a nonexpert police officer with personal knowledge and experience was allowed to render an opinion regarding how nightclubs make money. In affirming the district court's decision to admit this testimony as a lay opinion, this court found that K.S.A. 60-456(a) allows nonexperts to testify in the form of opinion or inference if the testimony is based on the perception of the witness and is helpful to provide the jury with a clearer understanding of his or her testimony. *McGraw*, 19 Kan. App. 2d at 1012-13.

Here, we find that the Deputy Voigts' opinion testimony was based on his personal knowledge and experience regarding drug jargon. As well, his testimony was reasonably helpful to the jury. See *United States v. Quintana*, 70 F.3d 1167, 1170-71 (10th Cir. 1995). We, therefore, conclude that the district court did not err in admitting Deputy Voigts' opinion testimony as to the meaning of the terms used in the text messages found on James' cell phone.

## Prosecutorial Misconduct

James contends that the prosecutor inappropriately commented in his closing argument on James' objection to the admission of the cell phone and text messages into evidence at trial. Specifically, the prosecutor made the following statement during the rebuttal portion of the closing argument:

"It's even more unlucky that he let somebody borrow his phone. Didn't tell us who, but somebody borrowed his phone and somebody received text messages on his behalf that were related to drugs. Not just one, now that's unlucky, but two. Boy, that's winning the bad luck lottery. Not just having two text messages, but one that . . . names him specifically, T-Ray. What's his excuse for that? Think about it. He has an excuse, a convenient excuse for every single thing that happened, except for that. What's his excuse for that? Ladies and gentleman *is it reasonable . . . to believe that Deputy Voigts, doing this for quite some time, would plant the text messages? You recall the State tried to get the phone into evidence. Who objected to that? I wonder why.*" (Emphasis added.)

In reviewing an allegation of prosecutorial misconduct, we apply a two-step inquiry to determine whether (1) the comments amounted to misconduct "outside the wide latitude that the prosecutor is allowed in discussing the evidence" and (2) if there was misconduct, whether it "prejudiced the jury against the defendant and denied the defendant a fair trial," *i.e.*, whether it amounted to plain error. *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011); *State v. McCaslin*, 291 Kan. 697, 715, 245 P.3d 1030 (2011). " '[T]he fundamental rule in closing arguments is that a prosecutor must confine his or her comments to matters in evidence.' " *State v. Huerta-Alvarez*, 291 Kan. 247, 263, 243 P.3d 326 (2010) (citing *State v. Murray*, 285 Kan. 503, 512, 174 P.3d 407 [2008]). Further, it is improper for a prosecutor to ask the jury to speculate about facts that are not in evidence. *State v. Jeffrey*, 31 Kan. App. 2d 873, 881, 75 P.3d 284 (2003).

In *State v. Finley*, 273 Kan. 237, 248, 42 P.3d 723 (2002), the Kansas Supreme Court held that it "is a well established law in this state that *rulings of the trial court on objections* to evidence are not a proper subject for a prosecutor's closing argument." (Emphasis added.) In the present case, the prosecutor asked the jury two rhetorical questions that related to a successful objection by

defense counsel to the admission of the cell phone at trial. He did not, however, use a fact that was not in evidence, nor did he comment on the court's ruling on the objection. Rather, the prosecutor used this rhetorical method to respond to defense counsel, who employed a similar rhetorical method in his portion of closing argument when he stated: "And what do we know about the text messages? We've never seen them . . . it's just what the officer has said about them."

In other words, the prosecutor was responding in rebuttal to defense counsel's suggestion that the State did not want the jury to see the actual text messages. Likewise, the prosecutor's comments were responsive to defense counsel's suggestion that Deputy Voigts might not be telling the truth regarding the content of the text messages. Had defense not made these suggestions, the prosecutor's rhetorical questions might have risen to the level of prosecutorial misconduct. Under the circumstances, however, we do not find that the rhetorical questions—when viewed in context—were outside the wide latitude that a prosecutor is allowed when discussing the evidence.

Even if we were to find that the prosecutor's statement fell outside the wide latitude allowed in discussing the evidence, we do not find that the rhetorical questions prejudiced the jury against James and denied him a fair trial. To analyze the second step of the inquiry, we consider three factors: "(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of jurors." *McCaslin*, 291 Kan. at 715-16. Although no particular factor is controlling in this analysis, the third factor can override the first two factors if the harmless error tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), are met; that is, the burden is on the State to prove, beyond a reasonable doubt, that the error did not affect the verdict. *McCaslin*, 291 Kan. at 715-16.

Based on our review of the record, we do not find that the rhetorical questions asked by the prosecutor in the rebuttal portion of

his closing argument constituted gross and flagrant conduct. As indicated above, the prosecutor only asked these questions once in response to defense counsel's closing argument. Moreover, we do not find that the prosecutor's rhetorical questions were emphasized, nor did they violate any rule designed to protect a constitutional right. Rather, the rhetorical questions were a minor part of the prosecutor's argument and were an understandable—if inelegant—attempt to refute defense counsel's suggestion during closing argument that Deputy Voigts may not have testified truthfully about the text messages, or that the State did not want the jury to see the actual text messages.

Likewise, when a prosecutor's improper comment concerns matters not significant to the State's case, the error is not gross and flagrant. See *State v. Baker*, 281 Kan. 997, 1013, 135 P.3d 1098 (2006). A review of the record in the present case reveals that the State presented a substantial amount of evidence at trial in support of the charges filed against James. Specifically, the evidence established that James had a large bag of marijuana and a set of scales in the glove box of his SUV, which he was driving at the time of the traffic stop. Both the bag of marijuana and the scales were admitted into evidence.

Deputy Voigts testified about the events on the night of December 10, 2009. In addition, a video of the traffic stop was admitted into evidence and it was viewed by the jury. On the video tape, the jurors could not only see what happened, but they could hear James giving inconsistent answers to Deputy Voigts' questions. Furthermore, the jurors could hear James taking responsibility for the marijuana found in his SUV. The video tape also showed Deputy Voigts searching James' cell phone and included comments regarding the text messages. Consequently, we find that the prosecutor's rhetorical questions asked during rebuttal were not significant to the State's case in light of the other evidence that the State presented at trial.

As to the second factor, we find that the neither the prosecutor's comments nor his conduct showed ill will. As indicated above, the rhetorical questions were raised briefly during the rebuttal portion of the State's closing argument and they were not repeated. Fur-

ther, the rhetorical questions were asked during the heat of the argument in response to arguments raised by defense counsel. As such, it seems likely that there was little—if any—forethought on the part of the prosecutor. Additionally, the rhetorical questions did not violate a court order.

Turning to the third factor, we find that the State presented overwhelming evidence to establish James' guilt beyond a reasonable doubt. Given the evidence, the jury would have likely found James guilty beyond a reasonable doubt for possession of marijuana with intent to sell even if the prosecutor had not asked the rhetorical questions during rebuttal, and even without the actual text messages being introduced into evidence. Not only was the large bag of marijuana located in the glove box of James' SUV, which he was driving at the time of the traffic stop, James took responsibility for it at the scene.

Furthermore, James admitted to owning the scales found in the same glove box in which the marijuana was found, and Deputy Voigts testified they were the type of scales used to measure out small quantities of marijuana for drug transactions. Although James called Madrid as a witness at trial, the jury clearly rejected Madrid's story that the marijuana belonged to him and was inadvertently left in the glove box of James' SUV. And it is the jury—not this court—that passes on the credibility of witnesses. See *State v. Trautloff*, 289 Kan. 793, 800, 217 P.3d 15 (2009). We, therefore, conclude that even if there was prosecutorial misconduct, it was harmless in light of the overwhelming evidence presented by the State at trial.

## Sufficiency of Evidence

James argues that there was not sufficient evidence to support his convictions because the State failed to prove he knowingly possessed the marijuana found in his SUV. As such, we must review all the evidence in the light most favorable to the prosecution to determine if there was sufficient evidence upon which a rational factfinder could have found James guilty beyond a reasonable doubt. *McCaslin*, 291 Kan. at 710. In reviewing the record, we are mindful that "[a] conviction of even the gravest offense can be

based entirely on circumstantial evidence and the inferences fairly deducible therefrom." 291 Kan. at 710.

To prove possession, the State had to present evidence that James knew about the marijuana. See *State v. Carrasco*, 28 Kan. App. 2d 683, 684, 19 P.3d 202 (2001). Absent a confession, possession can be constructive, " 'as when marijuana is kept by the accused in a place where he has some measure of access and right of control.' " *State v. Dean*, 42 Kan. App. 2d 32, 38, 208 P.3d 343 (2009) (citing *State v. Rose*, 8 Kan. App. 2d 659, Syl. ¶ 5, 665 P.2d 1111, *rev. denied* 234 Kan. 1077 [1983]).

Here, Deputy Voigts found the marijuana in the glove box of a vehicle that James was driving and admitted to owning. Moreover, Deputy Voigts found a set of scales—that James also admitted to owning—in the same glove box. These scales, according to the deputy, were the type of scales suitable for measuring out small amounts of marijuana. Likewise, there was evidence presented at trial that James accepted responsibility for the marijuana at the scene of the traffic stop.

James also had two text messages on his phone asking if he had marijuana. One, sent the day before the traffic stop, was addressed to "T-Ray," and it is undisputed that James' full name is Tommy Ray James. Moreover, James had air fresheners hanging from his rearview mirror, which Deputy Voigts testified are often used to mask the odor of marijuana. Accordingly, we conclude that there was sufficient evidence presented at trial to lead to the fair inference that James knew about the marijuana.

Furthermore, a defendant's proximity to drugs and the proximity of a defendant's possessions to drugs can support a finding of constructive possession. See *Dean*, 42 Kan. App. 2d at 39. Again, Deputy Voigts found marijuana in James' glove box after stopping James for driving with a headlight out. As such, James, who was in the driver's seat, was in close proximity to the marijuana contained in the glove box. Deputy Voigts also found James' scales in the glove box right next to the 1/2-pound bag of marijuana. Considering, in the light most favorable to the State, that James owned the vehicle, had a cell phone with drug related text messages, was in close proximity to the drugs, and had other possessions in close

proximity to the drugs, there was sufficient evidence to support the finding that James knowingly possessed the drugs.

*Cumulative Error*

Finally, James argues he is entitled to a reversal of his convictions and sentences because of cumulative error. In order to determine if there has been cumulative error, we review " 'whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial.' " *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010). Because we do not find that there has been error in this case, we do not find that there was cumulative error. Furthermore, even if the rhetorical question asked by the prosecutor during closing was inappropriate, it was at best only harmless error. And a single harmless error cannot constitute cumulative error. See *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010). Thus, considering the totality of the circumstances, there was no cumulative error in this case.

Affirmed.