No. 105,872

STATE OF KANSAS, *Appellee*, v. KEDRIN LITTLEJOHN, *Appellant*.

(316 P.3d 136)

Opinion filed January 14, 2014.

*Catherine A. Zigtema*, of Maughan & Maughan LC, of Wichita, argued the cause, and *Carl F.A. Maughan*, of the same firm, was with her on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury found Kedrin Littlejohn guilty of felony murder, aggravated robbery, aggravated kidnapping, and aggravated assault. The district court sentenced Littlejohn to a hard 20 life sentence plus a consecutive sentence of 277 months' imprisonment.

On appeal, Littlejohn raises several issues regarding the jury instructions given in this case. Additionally, he argues that (1) the district court erred in denying his motion to suppress the statements he made to detectives after being *Mirandized*; (2) the complaint filed against him was defective because each crime charged contained alternative means for committing the crime alleged; (3) the State presented insufficient evidence to convict him of any crime; and (4) cumulative error denied him his right to a fair trial.

We find that none of the issues raised by Littlejohn have merit; accordingly, we affirm his convictions.

## FACTS

On the morning of May 12, 2008, Littlejohn and Shannon Bogguess went to Jim Collins' used vehicle dealership in Wichita with a handgun, intending to take money from Collins by force. Bogguess and Littlejohn confronted Collins inside the dealership. When Collins resisted, Bogguess shot him in the leg. Bogguess and Littlejohn then put Collins in a Hummer motor vehicle that was at the business in an attempt to take Collins to an ATM, where they intended to force him to withdraw cash for them. As they were driving the Hummer down St. Francis Street in Wichita, Collins jumped from the moving vehicle into the street.

At approximately 8 a.m., several witnesses at the scene saw Bogguess and Littlejohn attempt to pick Collins up and get him back into the Hummer. When onlookers started to yell at Bogguess and Littlejohn, Littlejohn ran back to the Hummer and got into the front passenger seat. Bogguess stood by Collins for a few moments before running to the Hummer. Bogguess then walked back to where Collins was sitting in the street and shot him in the neck/shoulder area. Bogguess ran back to the Hummer, got into the driver's seat, and drove the vehicle south down the street.

After the Hummer drove off, Jeremy Linot, a witness at the scene, ran out to the middle of the street to help Collins. Linot saw that Collins was trying to roll to his left in an attempt to stand up. As Linot was aiding Collins, someone yelled out to him to look out. Linot looked up and saw that the Hummer had turned around and was heading back towards them. Linot reacted by trying to drag Collins off the street, but he had to give up his efforts in order to dodge the Hummer. The Hummer sped by, running over Collins.

The Hummer proceeded north on St. Francis Street and eventually turned west onto Lewis Street. Shortly thereafter, police and medical personnel arrived, and Collins was pronounced dead at the scene at 8:20 a.m. A crime scene investigator collected a cell phone and a 9 mm cartridge casing at the scene. It was later determined that the cell phone belonged to Bogguess.

David Dresher was walking east on Lewis Street a little after 8 a.m. when he saw the Hummer traveling very fast in the opposite direction. Dresher saw the Hummer drive through a stop sign and eventually come to a stop in the middle of the street where it remained for a few moments before backing up and driving into an alleyway on the south side of Lewis Street between Broadway and Topeka Streets. Dresher kept walking and eventually saw a police car come speeding from the west. Dresher realized that the police were probably looking for the Hummer, so he flagged the officer down and directed him to the alleyway where he had last seen the Hummer.

A second officer, John Duff, was driving his police car east on Lewis when he saw a man, later identified as Littlejohn, standing on the northwest corner of Lewis and Broadway Streets. Duff made eye contact with Littlejohn but continued east on Lewis in search of the Hummer. Duff saw that a police car was pulled over on Lewis and that an officer was speaking to Dresher, who was pointing back towards the west. Duff continued driving east on Lewis but soon turned around when he saw that the officer had driven his car further to the west, parked, and gotten out of his car with his gun drawn. Duff joined the officer at that position where they eventually located the Hummer parked in the alleyway. After

determining that no one was inside the Hummer or in the alley, the officers secured the area and reported the Hummer's license plate and vehicle identification numbers to dispatch.

After performing these duties, Duff was standing in the parking lot of a nearby Chinese restaurant when Littlejohn approached him. Littlejohn was breathing hard, sweating, and spitting—behavior Duff believed indicated that Littlejohn had been running. Duff recognized Littlejohn as the man he had previously seen standing on the corner of Lewis and Broadway, but at that time, Duff did not notice Littlejohn breathing hard, sweating, or spitting.

Littlejohn told Duff that he had been robbed, a story which amazed Duff considering the number of police cars traveling through the area that morning. Duff asked Littlejohn what had been taken from him, and Littlejohn said his cell phone. Duff asked Littlejohn where the robbery had occurred, and Littlejohn pointed at the Hummer and said that "they" had done it. Duff asked Littlejohn for his name, and Littlejohn told him that his name was Deidra Howard.

Littlejohn told Duff that the people in the Hummer had robbed him of his cell phone at gunpoint and made him get into the Hummer in the area of Douglas and Hillside Streets, an area quite a distance away from their current location. Littlejohn told Duff that the driver was a Hispanic male with blond hair that had been dyed red and that two other people were inside the Hummer—a white male with a pink shirt and a black male with gray hair. He said that the white male sat in the front passenger seat and the black male sat in the back passenger seat with Littlejohn. Duff asked Littlejohn if the men had taken anything besides his cell phone. Littlejohn said no.

Littlejohn was eventually transported to city hall for questioning. As they were walking into city hall, Littlejohn told Duff that his name was Kedrin Littlejohn, not Deidra Howard. Duff took Littlejohn to an interview room, handcuffed him to a table, and put a leg iron on his ankle. Duff left the interview room but later heard a commotion and went back inside. There, he saw Littlejohn laying on the floor and looking like he was having some sort of medical problem. Duff immediately yelled for help. When Duff crawled

underneath the table to unlock Littlejohn's leg iron, Duff noticed that Littlejohn had blood on the bottom of his shoes. Police removed Littlejohn's shoes and clothing and placed those items into custody. After giving him a jumpsuit to wear, Littlejohn was transported to the hospital where a doctor examined Littlejohn and determined that there was nothing medically wrong with him. Littlejohn was taken back to city hall and eventually interviewed by two detectives. The interview started at 1:53 p.m.

Prior to that time, police went to Collins' vehicle dealership and saw large amounts of blood on the floor in different locations within the shop area of the building. It was apparent to police that somebody had walked in the blood because they observed at least two different sole pattern impressions in the blood. A crime scene investigator later collected two shell casings and an unfired cartridge from the building.

At 1 p.m. that same day, police learned that Collins' credit cards were being used at the Towne East shopping area in Wichita. Police went to that location to investigate and ultimately arrested Bogguess at a nearby location. Credit cards belonging to Collins, as well as his used vehicle dealer's license, were found in Bogguess' possession. Also found in Bogguess' possession was a cell phone which was later determined to belong to Littlejohn. Police later reviewed video footage showing Bogguess using Collins' credit cards at a Sears store located at Towne East.

Additionally, police found a red Chevy Blazer parked in a Dillon's parking lot near Collins' dealership. The Blazer was registered to Carla Abraham, Littlejohn's mother. Police spoke to Abraham about the vehicle. She said that Littlejohn left her house very early that morning in the Blazer and that she had not seen or heard from him since that time. Inside the Blazer, police found a McDonald's paycheck stub made out to Littlejohn.

After being advised of and waiving his *Miranda* rights, Littlejohn spoke with detectives, repeating his story of being robbed by the occupants of the Hummer. After taking a 30-minute break, the detectives returned to the interview room and eventually told Littlejohn that bloody footprints were found inside Collins' dealership and that the sole patterns were consistent with his shoes. After

hearing this, Littlejohn admitted to participating in the crimes. Sometime after Littlejohn's shoes were seized, law enforcement determined that the sole pattern on Littlejohn's shoes matched the sole pattern of the bloody footprints found at Collins' dealership. Furthermore, Collins' DNA was found on one of Littlejohn's shoes and on his shirt.

Littlejohn told detectives that he had met Bogguess several months ago at a club in downtown Wichita. Littlejohn said that Bogguess had told him that he knew how they could get some money and that all Littlejohn would have to do was point a gun. Littlejohn said that in the weeks leading up to and on the morning of the incident, they discussed robbing Collins. Bogguess told Littlejohn that Collins had a lot of money and that Littlejohn could get $10,000 for participating in the robbery.

Littlejohn met Bogguess that morning at the Dillon's parking lot. They entered Collins' building using the back stairway. Inside, they confronted Collins. Littlejohn admitted to pointing a gun at Collins and ordering him to get down on the floor. As Littlejohn was doing this, Bogguess went and retrieved a set of keys—presumably the keys to the Hummer that was parked in the garage area of the building. Littlejohn said that when Bogguess returned, he took the gun from him. At this point, Collins attacked Bogguess. During the struggle, Bogguess fired the gun twice—once at the ceiling and once at Collins, shooting him in the leg.

After Collins was shot, he fell to the floor. As Bogguess picked Collins up and put him into the Hummer, Littlejohn held the gun. Littlejohn said that the purpose of placing Collins in the Hummer was that they planned to take him to an ATM machine to get cash. They left the building in the Hummer, but before they could make it to an ATM machine, Collins jumped out of the vehicle on St. Francis Street.

Littlejohn said that after Collins jumped out of the Hummer, they stopped the vehicle, got out, and tried to get Collins off the street and back into the vehicle. Littlejohn said that Collins yelled for help while he was on the street, and Bogguess told him to shut up. When it became apparent that they could not get Collins back into the vehicle, Littlejohn went back to the Hummer and got into

the front passenger seat. When Bogguess came back to the Hummer, Littlejohn said that he gave the gun to Bogguess or Bogguess took possession of the gun. Bogguess then walked back and shot Collins. Littlejohn said that he did not actually see Bogguess shoot Collins, but he heard the gunshot. Bogguess got into the driver's seat of the Hummer and drove the vehicle away before turning it around and running over Collins.

Littlejohn said that they drove to an area that he was unfamiliar with and ditched the Hummer. As they ran from the Hummer, Bogguess dropped the gun they had used in a nearby trash can. Subsequently, police recovered a 9 mm semiautomatic handgun from a trash can located at the southwest corner of Broadway and Lewis. A firearms examiner later confirmed that shell casings recovered from Collins' place of business and at the scene of the shooting on St. Francis Street had been ejected from this gun.

Littlejohn told detectives that he and Bogguess ran together to a nearby McDonald's. Notably, a witness who was pulling out of the McDonald's drive-through that morning reported to police that she saw two men—fitting the descriptions of Littlejohn and Bogguess—running past the restaurant together. Littlejohn stated that when they got to McDonald's, he realized that he did not have his cell phone, so he turned around and ran back to the Hummer. Bogguess continued running. By the time Littlejohn got to the area where the Hummer was parked, police had already arrived at the scene. It was at this point when Littlejohn decided to approach an officer and tell him that he was the victim of a robbery.

At 5:32 p.m., after Littlejohn's interview was completed, he began complaining about having chest pains. He was transported to the hospital where he was again checked and determined to be suffering no medical complications. He was released from the hospital and taken back to the city building. While waiting to be transported to the Sedgwick County Adult Detention Facility, Littlejohn asked an officer how long he would be in jail. The officer told him that she did not know. In response, Littlejohn said, "I'm going to get probably life." Littlejohn was eventually transported and booked into the detention facility.

A firearms trace through the Bureau of Alcohol, Tobacco, and Firearms of the 9 mm handgun recovered from the trash can determined that the gun had been part of a multiple gun purchase by a woman named Jocqulyn Johnson. A detective spoke with Johnson and learned that the handgun had been stolen from a vehicle parked in Johnson's driveway sometime between April 11 and April 25, 2008. Johnson and Littlejohn's mother lived on the same residential block. Littlejohn had been living at his mother's residence in April 2008.

During their investigation, police reviewed the cell phone records of Littlejohn and Bogguess, which showed that they had the following text-message exchange on the morning of May 12, 2008:

7:07 a.m.—Littlejohn to Bogguess—"what's up?"

7:09 a.m.—Bogguess to Littlejohn—"what's up, I'm here waiting. He should be here pulling up at any minute."

7:09 a.m.—Littlejohn to Bogguess—"where you at, I'm on my way."

7:13 a.m.—Bogguess to Littlejohn—"Douglas and Chautauqua."

7:18 a.m.—Littlejohn to Bogguess—"here I come."

7:19 a.m.—Bogguess to Littlejohn—"Bet."

7:27 a.m.—Littlejohn to Bogguess—"I'm on Douglas."

7:28 a.m.—Bogguess to Littlejohn—"stop before you get to the store."

7:29 a.m.—Littlejohn to Bogguess—"K."

7:31 a.m.—Bogguess to Littlejohn—"the Dillons."

7:39 a.m.—Littlejohn to Bogguess—"where he at."

7:46 a.m.—Bogguess to Littlejohn—"hurry and do it." (This message failed to be delivered to Littlejohn.)

Jaime Oeberst, the district coroner for Sedgwick County and the chief medical examiner at the Sedgwick County Regional Forensic Science Center, performed an autopsy on Collins on May 13, 2008. Oeberst determined that Collins had suffered multiple blunt-force injuries and sustained two gunshot wounds—one to the right side of his head and one to his lower left leg. Oeberst noted that the gunshot wound to Collins' head showed that the bullet entered behind Collins' right ear, traveled downward and through his upper neck, and exited near the left corner of his mouth. Oeberst found gunpowder residue around the entrance wound, indicating that the gun was fired no greater than a foot away from Collins' head.

With regard to the injuries Collins sustained as a result of being run over by the Hummer, Oeberst noted that Collins suffered multiple skull fractures and suffered fractures to his sixth cervical vertebra, ribs, sternum, and lumbar spine. Furthermore, both of Collins' shoulders were dislocated, his collarbone was dislocated, and his right shoulder blade was fractured.

Oeberst opined that the cause of Collins' death was multiple blunt force injuries and that the gunshot wound to Collins' neck contributed to his death. She stated that the gunshot wound alone could have proven to be fatal but that the blunt force trauma (*i.e.*, the injuries Collins sustained as a result of being run over by the Hummer) killed Collins before the gunshot wound could.

The State charged Littlejohn with alternative counts of premeditated first-degree murder and first-degree felony murder and single counts of aggravated robbery, aggravated kidnapping, and aggravated assault based on the act of nearly running over Jeremy Linot with the Hummer. Littlejohn's case proceeded to a jury trial where the State presented the above-mentioned facts.

Carla Abraham, Littlejohn's mother, testified for the defense at trial. She said that on May 11, 2008, which was Mother's Day, Littlejohn spent the day with her. Abraham said that Littlejohn told her about a possible job he was really excited about which involved working at a car lot.

Littlejohn testified at trial, claiming that Bogguess forced him at gunpoint to participate in the robbery and kidnapping of Collins and that Bogguess acted alone in killing Collins.

Littlejohn said that he had known Bogguess for only a couple of weeks prior to the robbery. About a week prior to the robbery, Littlejohn complained to Bogguess about being unsatisfied with working at McDonald's. In response, Bogguess told Littlejohn that he was making $10 an hour detailing cars and that he could get Littlejohn a job doing the same thing.

Littlejohn said that Bogguess called him on the evening of May 11, 2008, asking him if he was still interested in the job detailing cars. Littlejohn said he was, so Bogguess told Littlejohn to meet him at Collins' vehicle dealership the next morning at 7:30 a.m. The next day, Littlejohn woke up at 7 a.m. and drove the Chevy

Blazer to the area and parked the vehicle in the Dillon's parking lot. When he parked, Littlejohn saw that Bogguess was standing outside of Collins' building next to the garage door.

Littlejohn said he walked over to Bogguess, and Bogguess told him that the man he needed to speak to about the job was upstairs in his office. Littlejohn walked up the outside flight of stairs and into the building. He walked down a hallway and into an office where he saw Collins. Littlejohn told Collins that he was there for the detailing job. Collins told Littlejohn that he did not know what Littlejohn was talking about. Littlejohn explained to Collins that Bogguess had told him about the detailing job and that he was downstairs. Collins said that they should go downstairs to see what Bogguess was talking about.

Collins and Littlejohn walked down a different flight of stairs that led to the garage area on the floor level of the building. They walked towards the garage door which was open and looked around but did not see anybody. Littlejohn said at that moment, Bogguess came into the garage holding a gun. Littlejohn said that he and Collins reacted by putting their hands up in the air. Bogguess pointed the gun at Collins and said, "[Y]ou been fucking me out of my money. I want my money you owe me." In response, Collins said, "Come on Shane, why are you doing this?" Bogguess then shot Collins in the leg, causing Collins to fall to the floor. Littlejohn said that Bogguess then pointed the gun at him and ordered him to help put Collins in the Hummer. Littlejohn told Bogguess that he did not "want any part of this." In response, Bogguess fired a shot in the air. At that point, Littlejohn complied and helped get Collins into the Hummer. Once Collins was in the vehicle, Bogguess told Littlejohn to give him his cell phone, which Littlejohn did. Bogguess then told Littlejohn that he could either get into the Hummer or get shot. Littlejohn said that he got into the front passenger seat of the Hummer. Bogguess got into the driver's seat and drove the Hummer out of the garage and onto the street. Bogguess eventually turned onto St. Francis Street where Collins jumped from the vehicle.

After Collins jumped, Littlejohn said that Bogguess stopped the Hummer and told him to get out and help load Collins back into

the vehicle. Littlejohn said he walked over to Collins, put his hand out, and asked Collins to please get back into the Hummer because he, Littlejohn, did not want to get shot. According to Littlejohn, Collins scooted away from them and called out for help. Bogguess told Littlejohn to get Collins into the car. Littlejohn refused, saying he was not going to touch him. Bogguess then told him to go back to the Hummer. Littlejohn did so and got into the front passenger seat. Littlejohn said at that point, he looked for the keys, but they were not in the ignition. Bogguess then walked up to the driver's side window and told Littlejohn to help him get Collins back into the Hummer. According to Littlejohn, he just sat there and told Bogguess that he was not helping him. In response, Bogguess started screaming. Bogguess then walked back to where Collins was sitting in the street and shot him. Bogguess then ran back and got into the driver's seat of the Hummer and drove the vehicle away but returned and ran over Collins.

Littlejohn said that after Bugguess parked the Hummer in the alleyway, he got out of the vehicle and ran towards McDonald's. Bogguess chased after him and yelled for him to wait and come back. After they ran past McDonald's, Littlejohn said Bogguess eventually stopped chasing him and ran in a different direction.

Littlejohn said that he eventually ran back to the front of McDonald's and saw a police car drive by and go towards the alleyway where the Hummer was parked. He then ran towards the police car and encountered Officer Duff. Littlejohn said that he told Duff that his name was Deandra and that he had been robbed by the occupants of the Hummer. Littlejohn explained that Deandra was his middle name. He denied telling Duff that his name was Deidra Howard.

Littlejohn testified that he made up the story of being a victim of a robbery because, at the time, he was on probation and was afraid that his probation would be revoked if he told police that Bogguess forced him to participate in the crimes. Furthermore, Littlejohn said that he told the detectives that he was a participant in the crimes because he thought that was what they wanted to hear. He explained that he did not tell them the story that he was testifying to at trial—that he went to Collins' place of business for

a job interview and was subsequently forced to participate in the crimes—because he did not think they would believe him. Finally, Littlejohn denied ever pointing the gun at Collins or even having possession of the gun.

The jury found Littlejohn guilty of felony murder, aggravated robbery, aggravated kidnapping, and aggravated assault. The district court sentenced Littlejohn to a hard 20 life sentence for the felony-murder conviction and a consecutive sentence of 277 months' imprisonment for the remaining convictions. Littlejohn filed a timely notice of appeal.

## JURY INSTRUCTIONS

On appeal, Littlejohn contends that the district court erred in instructing or failing to instruct the jury on several issues. Littlejohn argues that the district court erred when it: (1) failed to instruct the jury on both second-degree intentional and unintentional murder as lesser included offenses of felony murder; (2) failed to give a unanimity instruction in connection to the felony-murder charge; (3) instructed the jury on criminal liability based on an aiding or abetting theory; and (4) instructed the jury on the defense of compulsion.

Littlejohn concedes on appeal that he failed to request jury instructions on second-degree intentional and unintentional murder and failed to object to the district court's instructions regarding criminal liability based on aiding or abetting and the defense of compulsion. Accordingly, a clearly erroneous standard of review applies to these issues. See K.S.A. 22-3414(3). But, Littlejohn contends that he requested a unanimity instruction in connection to the felony-murder charge, resulting in the application of the more favorable harmless error standard of review. See *State v. Plummer*, 295 Kan. 156, 162-63, 283 P.3d 202 (2012).

Based on the transcript of the jury instruction conference, it is clear that the district court, not Littlejohn, proposed giving a unanimity instruction in connection to the felony-murder charge. The district court believed such an instruction was necessary because the State alleged that the felony-murder charge was supported by two separate underlying felonies (*i.e.*, the aggravated robbery or

aggravated kidnapping of Collins) and, thus, the jury, if it found Littlejohn guilty of felony murder, had to be unanimous as to which underlying felony supported the conviction. The State objected to the district court's proposed unanimity instruction, stating that the two underlying felonies being alleged in support of the felony-murder charge presented alternative means, not multiple acts, of committing the felony murder. Accordingly, the State argued that a unanimity instruction was unwarranted. See *State v. Bailey*, 292 Kan. 449, 458, 255 P.3d 19 (2011) ("[D]ifferent underlying felonies supporting a charge of felony murder are alternative means rather than multiple acts."); see also *State v. Becker*, 290 Kan. 842, Syl. ¶ 4, 235 P.3d 424 (2010) ("In an alternative means case the jury must be unanimous as to guilt for the single crime charged, but not as to the particular means by which the crime was committed, so long as substantial evidence supports each alternative means.").

Defense counsel did not provide the district court with a legal argument as to why a unanimity instruction should be given in connection with the felony-murder instruction. He merely stated that he was "not going to agree" with not giving the instruction. The district court agreed with the State's argument and decided not to give a unanimity instruction.

Now on appeal, Littlejohn provides this court with a legal argument that he failed to provide to the district court. He claims that the felony-murder charge was supported by multiple acts (*i.e.*, Bogguess shooting Collins in the street and Bogguess running Collins over with the Hummer) which individually could have constituted the crime of felony murder. Based on this new assertion, he argues the district court should have given its proposed unanimity instruction.

As we have explained, "it is important to remember that the purpose of requiring an objection is to allow the district court to correct an error, if one occurred. [Citation omitted.]" *State v. Ellmaker*, 289 Kan. 1132, 1139, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010). In *Ellmaker*, the defendant objected to an instruction on one ground but asserted a different argument on appeal. Under those circumstances, even though the defendant had objected to the instruction, this court concluded the defendant

failed to comply with K.S.A. 22-3414(3) and, thus, applied a clearly erroneous standard of review. *Ellmaker*, 289 Kan. at 1139; see *State v. Tapia*, 295 Kan. 978, 995, 287 P.3d 879 (2012) (clearly erroneous standard of review applied on appeal to defendant's jury instruction issue when defendant's request for jury instruction before district court was interpreted as being so indistinct as to not clearly communicate the request or, alternatively, as being different from the request he was making on appeal).

Accordingly, review of all the jury instruction issues raised in this appeal is controlled by K.S.A. 22-3414(3) and the stair-step analytical process set out in *State v. Herbel*, 296 Kan. 1101, Syl. ¶¶ 7-8, 299 P.3d 292 (2013), and *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012). As *Williams* articulated, K.S.A. 22-3414(3) creates a procedural hurdle when a party fails to object because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included offense instruction, unless the giving or failure to give the instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. *Williams*, 295 Kan. at 512-13.

To establish that the giving or failure to give an instruction was clearly erroneous, the reviewing court must determine whether there was any error at all. This requires demonstrating that giving the proposed instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. *Williams*, 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different verdict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516.

A. *Did the district court err in failing to instruct the jury on second-degree intentional and unintentional murder as lesser included offenses of felony murder?*

1. *Were these instructions legally appropriate?*

K.S.A. 21-3402 defines second-degree murder as "the killing of a human being committed: (a) Intentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." The statute focuses culpability on whether the killing is intentional or unintentional, not whether a deliberate and voluntary act leads to death. *State v. Deal*, 293 Kan. 872, 885, 269 P.3d 1282 (2012). Both types of second-degree murder constitute lesser included offenses of felony murder. See *State v. Calvin*, 279 Kan. 193, 202, 105 P.3d 710 (2005). But see K.S.A. 2012 Supp. 21-5109(b)(1) (there are no lesser degrees to felony murder effective July 1, 2012); see also *State v. Wells*, 297 Kan. 741, Syl. ¶ 8, 305 P.3d 568 (2013) ("Because the legislature's 2012 amendment to K.S.A. 21-5109 regarding lesser included crimes was not merely procedural or remedial but substantive, it is not to be applied retroactively to a case pending on appeal at the time of the amendment."). The instructions on second-degree intentional murder and second-degree unintentional murder would have been legally appropriate in this case.

2. *Were these instructions factually appropriate?*

Because the evidence presented at trial showed that Bogguess killed Collins by running him over with the Hummer, Littlejohn's guilt for either type of second-degree murder would have to be based on an aiding or abetting theory. Second-degree intentional murder is a specific-intent crime requiring the defendant to have the specific intent to kill. *Deal*, 293 Kan. at 883. Furthermore, "[f]or a defendant to be convicted of a specific-intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal." *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010).

Even if we assume without deciding that an instruction on second-degree intentional murder would have been factually appropriate, we conclude that failing to give such an instruction was not

clearly erroneous. The evidence presented at trial clearly established that Littlejohn was guilty of felony murder because he participated in an aggravated robbery and aggravated kidnapping of Collins and that Collins was killed during the commission of, attempt to commit, or flight from these two inherently dangerous felonies. See K.S.A. 21-3401(b) (felony murder); K.S.A. 21-3436(a)(2) and (4) (identifying aggravated kidnapping and aggravated robbery as inherently dangerous felonies); *State v. Ransom*, 288 Kan. 697, 713-14, 207 P.3d 208 (2009) ("[A] defendant may be convicted of felony murder even if the victim was not killed by the defendant . . . as long as the homicide occurred as a direct result of an inherently dangerous felony."). Accordingly, we are not firmly convinced that the jury would have reached a different verdict had the district court instructed the jury on second-degree intentional murder as a lesser included offense of felony murder.

With regard to second-degree unintentional reckless murder, this court stated in *Deal* that this type of murder is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge the victim is in imminent danger, although death is not foreseen. *Deal*, 293 Kan. at 884. As Littlejohn concedes in his brief, the facts of this case established that Collins' death resulted from an act intended to bring about his death. Thus, an instruction on second-degree unintentional but reckless murder would have been factually inappropriate. *Cf. State v. Cordray*, 277 Kan. 43, 56, 82 P.3d 503 (2004) (evidence sufficient to support jury verdict of unintentional but reckless second-degree murder where the defendant fired a gun in the general direction of a vehicle at night, striking an occupant); *State v. Jones*, 27 Kan. App. 2d 910, 915, 8 P.3d 1282 (2000) (held jury could have found evidence supporting recklessness where witnesses testified defendant shot gun randomly over crowd of people with eyes closed).

B. *Did the district court err in not giving a unanimity instruction in connection with the felony-murder instruction?*

As mentioned above, Littlejohn contends that the district court should have given a unanimity instruction regarding the felony-

murder charge because the jury was presented with evidence of multiple acts (*i.e.*, Bogguess shooting Collins in the street and Bogguess running Collins over with the Hummer) which individually could have constituted the crime of felony murder.

### 1. *Was this instruction legally appropriate?*

"When several acts are alleged, any one of which could constitute the crime charged, the court is presented with a multiple acts case that requires the jury to be unanimous as to which one of the acts the defendant committed." *State v. Jones*, 295 Kan. 1050, Syl. ¶ 3, 288 P.3d 140 (2012); see *State v. Sanborn*, 281 Kan. 568, 569, 132 P.3d 1277 (2006) ("A unanimity instruction is used when the State charges one crime *but relies on multiple acts to support that one crime.*" [Emphasis added.]). To ensure unanimity in such cases, the district court must give the jury a unanimity instruction, or the State must elect the particular act it relies on for conviction. *State v. Voyles*, 284 Kan. 239, 244-45, 160 P.3d 794 (2007).

In *Voyles*, this court laid down analytical steps to follow when considering a multiple acts claim on appeal. The threshold question in the *Voyles* framework, over which an appellate court exercises unlimited review, is whether the case truly involves multiple acts, *i.e.*, "*whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary.*" (Emphasis added.) *State v. Trujillo*, 296 Kan. 625, 629-30, 294 P.3d 281 (2013). If this case does not involve multiple acts, then Littlejohn's argument fails. See *Voyles*, 284 Kan. at 244.

Bogguess' acts of shooting Collins and then running him over with the Hummer do not constitute multiple acts supporting the felony-murder charge against Littlejohn because those actions could not have given rise to multiple counts of felony murder. Regardless of the number of potentially fatal acts performed against Collins, he could only be killed once during the commission of, attempt to commit, or flight from the underlying felonies supporting the felony-murder charged in this case. Accordingly, Littlejohn could only be charged and convicted of a single count of felony murder. Thus, a unanimity instruction in connection with the felony-murder charge would not have been legally appropriate.

C. *Did the district court err in instructing the jury regarding aiding or abetting?*

Next, Littlejohn argues that the district court erred by not adding the following language to the aiding or abetting instruction given to the jury: "Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime are themselves insufficient to establish guilt as an aider and abettor." *State v. Green*, 237 Kan. 146, Syl. ¶ 4, 697 P.2d 1305 (1985).

The district court instructed the jury that an aider or abettor is one

"who, either before or during its commission intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Littlejohn contends that the above instruction—which was based on PIK Crim. 3d 54.05—was insufficient because the jury could have still found him guilty of the crimes charged despite him testifying at trial that he was compelled to participate in the crimes and was merely present when the crimes at issue occurred.

Though the additional language is a correct statement of law, this court has repeatedly held that juries are presumed to intuit from the word "intentionally" in PIK Crim. 3d 54.05 that proof of mere association or presence would be insufficient to convict. See, *e.g., State v. Edwards*, 291 Kan. 532, 551-52, 243 P.3d 683 (2010); *State v. Davis*, 283 Kan. 569, 581-83, 158 P.3d 317 (2006); *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987). Based on that precedent, we decline to find that the district court's refusal to add the requested language to the pattern instruction on aiding or abetting was clearly erroneous. But, as we recently noted in *State v. Llamas*, 298 Kan. 246, 261-62, 311 P.3d 399 (2013),

"The better practice would be to include the mere association or presence language when a defense is based on the theory that a defendant was merely present and did not actively aid and abet a crime. We encourage trial judges to use language from our cases, such as was suggested in this case. Failing to do so may not constitute error if, as in this case, the instructions properly and fairly state the law as applied to the facts of the case. [Citations omitted.] That does not mean the instruction cannot be improved upon, and adding the mere association or

presence language would do so by explaining the legal concepts in commonly understood words."

### D. *Did the district court err when it instructed the jury regarding the defense of compulsion?*

Based on Littlejohn's testimony at trial, the district court believed that it was necessary and appropriate to give the following instruction to the jury regarding the defense of compulsion:

"Compulsion is a defense if the defendant acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would have been inflicted upon him had he not acted as he did.

"Compulsion is not a defense to a crime of First Degree Murder—Premeditated.

"Compulsion may be a defense to a crime of First Degree Murder—Felony Murder—if the compulsion is also applicable to the underlying acts, i.e.,—Aggravated Robbery or Aggravated Kidnapping.

"*Such a defense is not available to one who willfully or wantonly placed himself in a situation in which it was probable that he would have been subjected to compulsion or threat.*" (Emphasis added.)

See *Hunter*, 241 Kan. at 642 (Compulsion may be used as a defense to felony murder when compulsion is a defense to the underlying felony.).

Littlejohn contends that the district court erred when it included the italicized language within its instruction on the defense of compulsion. He argues that there was no evidence presented at trial showing that he willfully or wantonly placed himself in a situation where it was probable that he would be subjected to compulsion or threat. Instead, Littlejohn contends that the evidence presented at trial established that he was either a voluntary participant in the crimes or that he was an innocent victim who was led to Collins' dealership under false pretenses and was subsequently forced against his will to participate in the crimes. He contends that by including the willful or wanton language, the instruction improperly expanded his criminal liability for the crimes committed against Collins because the instruction could have led the jury into concluding that his mere presence within the vicinity of the crimes committed by Bogguess made him criminally liable for those acts.

*1. Was this instruction legally appropriate?*

The district court's compulsion instruction was based on PIK Crim. 3d 54.13, which in turn is based on K.S.A. 21-3209. That statute states:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted up him . . . if he does not perform such conduct.

"(2) *The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat.*" (Emphasis added.)

Clearly, the last paragraph of the district court's instruction is based on subsection (2) of K.S.A. 21-3209. Because the district court instructed the jury on the defense of compulsion, it was legally appropriate for the district court to also instruct the jury on the circumstances which prevent a defendant from raising a compulsion defense.

*2. Was this instruction factually appropriate?*

In the Notes on Use to PIK Crim. 3d 54.13, it states that the instructional language regarding when the defense of compulsion is unavailable "should be used only when there is some evidence indicating that the defendant willfully or wantonly placed himself or herself in the situation indicated." In *State v. Scott*, 250 Kan. 350, 827 P.2d 733 (1992), this court explained the types of situations that would prevent a defendant from raising a compulsion defense. The court stated:

"A compulsion defense is not available to a person who willfully or wantonly places himself or herself in a situation in which it is probable that compulsion or threat will occur; thus, *a person who connects himself or herself with criminal activities or is otherwise indifferent to known risks cannot use compulsion as a defense.*" (Emphasis added.) *Scott*, 250 Kan. 350, Syl. ¶ 6.

Though Littlejohn testified at trial that he went to Collins' used vehicle dealership for a job interview and ended up being compelled by Bogguess to participate in the crimes, the State's evidence indicated that he was a voluntary participant in all the

crimes. The jury, however, was not required to accept either version in toto. See *In re J.W.S.*, 250 Kan. 65, 67-68, 825 P.2d 125 (1992) ("It is respondent's position that there was no evidence he aided and abetted in the death of Sauer. If Malone is believed, respondent was the principal. If respondent's version is believed, then he was guilty of no crime. This rationale is faulty. The jury was not required to accept, in toto, either version."); *State v. Lashley*, 233 Kan. 620, 628, 664 P.2d 1358 (1983) (same). Therefore, the jury could have found that Littlejohn went to Collins' vehicle dealership knowing that Bogguess intended to rob Collins and that Bogguess subsequently forced Littlejohn to participate in the other crimes. Thus, it was factually appropriate for the district court to inform the jury of when the defense of compulsion is unavailable to a defendant.

## POST-*MIRANDA* STATEMENTS

Next, Littlejohn argues that the district court erred when it failed to grant his motion to suppress his post-*Miranda* statements to police. Littlejohn made a contemporaneous objection at trial regarding the statements.

"When reviewing a district court ruling on a motion to suppress a confession, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Ransom*, 288 Kan. 697, Syl. ¶ 1, 207 P.3d 208 (2009).

Prior to trial, Littlejohn filed a motion seeking to have his post-*Miranda* statements to police suppressed because he did not voluntarily and intelligently waive his rights under *Miranda* and because his statements to police were involuntary and coerced by the police. Within his motion, Littlejohn did not provide any factual allegations to support his claims.

A pretrial hearing on the motion was conducted on October 8, 2010. At the hearing, the district court judge stated that in preparation for the hearing, he had reviewed a DVD recording and transcript of Littlejohn's interrogation. Notably, neither the DVD nor the transcript is included within the record on appeal. At the

hearing, Dr. Mitchell Flesher testified on behalf of the defense regarding an evaluation of Littlejohn he conducted in September 2009, 14 months after Littlejohn was interviewed by the detectives. Detective Blake Mumma, one of the detectives who interviewed Littlejohn, testified on behalf of the State regarding how he conducted the interview (including how he *Mirandized* Littlejohn) and what Littlejohn's demeanor was like during the interview.

After hearing this evidence, the district court judge made the following findings of fact and conclusions of law:

"Nowhere through this entire interview, which I did watch every minute of every question, every answer of it, and I was especially watching the physical presentation, the verbal delivery, all of those matters relating to Mr. Littlejohn, I noted nothing that gave me any consideration at all that he was under the influence of any drugs or alcohol. That he was under the belief that he had to say these things. That he was being coerced in some way to say these things. Absolutely there were no promises made. No promises of leniency or any favorite—any favoritism or favored treatment that might result from his giving a statement.

"There is nothing whatsoever in my review of the tape, and now especially considering the testimony and report of Dr. Flesher, that leads me to believe that Mr. Littlejohn did not understand the *Miranda* warnings as were given to him, that he did not appreciate them, and that there's nothing that leads me to believe that his waiver of them was anything other than knowing, intelligent, freely, and voluntarily given.

"Yes, he's not as intelligent as measured by Dr. Flesher as other people. But in and of itself that's not a factor that would invalidate or make involuntary his statements.

"For those reasons I will deny the motion that was filed on October 9 of 2009."

It is clear from this district judge's ruling that he relied heavily on the DVD recording and transcript of Littlejohn's interrogation to determine whether Littlejohn voluntarily waived his *Miranda* rights and whether his statements to the detectives were freely made. In order to determine whether the district court's ruling on the suppression motion was supported by substantial competent evidence, it would be necessary to review the DVD and transcript. Unfortunately, Littlejohn has failed to include this evidence within the record on appeal, which prevents review of his claim. See *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 (2012) ("The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error."); see also *State*

*v. Cervantes-Puentes*, 297 Kan. 560, 564, 303 P.3d 258 (2013) ("But Cervantes-Puentes failed to include the photo array in the appellate record, preventing our review of the district court's factual findings and legal conclusion regarding the array.").

## DEFECTIVE COMPLAINT

Next, Littlejohn argues that each charge filed against him contained alternative means for committing the crime alleged. Based on this assertion, he claims that the complaint lacked sufficient specificity to apprise him of the nature of the charges. Littlejohn did not file a bill of particulars prior to trial or file a motion to arrest judgment after his trial was complete.

A defendant challenging the sufficiency of the charging document for the first time on appeal must show the alleged defect either "(1) prejudiced the defendant's preparation of a defense; (2) impaired the defendant's ability to plead the conviction in any subsequent prosecution; or (3) limited the defendant's substantial rights to a fair trial. [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 254, 200 P.3d 1275 (2009); see *State v. McElroy*, 281 Kan. 256, 261, 130 P.3d 100 (2006).

K.S.A. 22-3201(b) states in pertinent part: "The complaint, information or indictment shall be a plain and concise written statement of the essential facts constituting the crime charged, which complaint, information or indictment, drawn in the language of the statute, shall be deemed sufficient."

In making his argument, Littlejohn does not contend that the charges filed against him failed to allege any essential facts or were not drawn in the language of the applicable statutes. He merely claims—providing no explanation or legal authority for his claims—that because each charge contained alternative means for committing the crime charged, the complaint prejudiced his ability to prepare a defense and impaired his "ability to plea" his convictions in a subsequent prosecution.

Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013). An issue not briefed by

the appellant is deemed waived and abandoned. *State v. Holman*, 295 Kan. 116, 125, 284 P.3d 251 (2012).

Even if we ignore Littlejohn's failure to properly brief this issue, we still reject his argument. In *State v. Saylor*, 228 Kan. 498, 503-04, 618 P.2d 1166 (1980), this court stated: "It has long been the law of Kansas that an accusatory pleading in a criminal action may, in order to meet the exigencies of proof, charge the commission of the same offense in different ways." Furthermore, in an alternative means case, the State is not required to elect one means or another when presenting its case to the jury or when requesting jury instructions. *State v. Stevens*, 285 Kan. 307, 309, 172 P.3d 570 (2007), *overruled on other grounds by State v. Ahrens*, 296 Kan. 151, 158-61, 290 P.3d 629 (2012). Accordingly, Littlejohn's complaint that the charges filed against him contained alternative means and, thus, rendered the complaint deficient is without merit.

### Sufficiency of the Evidence

Next, Littlejohn raises a number of conclusory arguments in his brief in an effort to show that the State presented insufficient evidence to convict him of any crime:

When the sufficiency of the evidence is challenged in a criminal case, this court reviews such claims by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or evaluate the credibility of witnesses. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011).

In his brief, Littlejohn first claims that the State

"failed to establish beyond a reasonable doubt the defendant's individual participation in the joint criminal venture, the defendant's use of or possession of the firearm in this matter, and the defendant's continued intent to participate in the vehicular trauma to the victim after completion of the initial offense with the shooting of the victim."

Littlejohn provides no citation to the record in support for these claims, nor does he provide any explanation of how these claims

relate to each individual conviction. Regardless, Littlejohn's statements to the detectives, when viewed in the light most favorable to the State, established that Littlejohn and Bogguess planned to rob Collins and acted on this plan on the morning of May 12, 2008. Furthermore, Littlejohn admitted to detectives that he pointed the gun at Collins while inside his business establishment.

With regard to his "continued intent to participate in the vehicular trauma to the victim" claim, Littlejohn is presumably arguing that in order to be convicted of felony murder, there had to be evidence presented at trial showing that he had the intent to kill Collins when Bogguess ran him over with the Hummer. This claim has no merit. In order to convict Littlejohn of felony murder, the State had to show that Littlejohn participated in an aggravated robbery and aggravated kidnapping of Collins and that Collins was killed during the commission of, attempt to commit, or flight from these two inherently dangerous felonies. Again, Littlejohn's statements to detectives established that he participated in both the aggravated robbery and aggravated kidnapping of Collins. And the jury could certainly conclude from the evidence that, at the very least, Collins was killed while Littlejohn and Bogguess were attempting to flee from the crimes they just committed. See *State v. Cheffen*, 297 Kan. 689, 699, 303 P.3d 1261 (2013) (The phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony" in K.S.A. 21-3401[b] does not create alternative means; instead, the phrase describes factual circumstances sufficient to establish a material element of felony murder.).

Next, Littlejohn claims that the evidence established that Collins' death resulted from either being shot or run over by the Hummer. Accordingly, he claims that the State had to establish his liability for Collins' murder under "each alternative means theory" and that it failed to do so. Littlejohn's argument is without merit. There is absolutely no language in the felony-murder statute to suggest that the possible ways in which someone is killed during the commission of, attempt to commit, or flight from an inherently dangerous felony create alternative means of committing felony murder. See *State v. Brown*, 295 Kan. 181, 189-90, 199-200, 284 P.3d 977 (2012) (The first step in an alternative means analysis is

determining whether the criminal statute supporting the charged crime is an alternative means statute. If so, the elements instruction incorporating the language of the statute should be tailored to include only those alternative means for which there is some evidence.).

Next, Littlejohn contends that his conviction for aggravated robbery should be reversed because in the complaint charging him with the crime, the State alleged that the property taken from the person or presence of Collins was "keys, Hummer, and credit cards." Littlejohn argues that the individual pieces of property alleged to have been taken from Collins established either alternative means of committing aggravated robbery or multiple acts which would warrant a unanimity instruction in connection to the jury instruction on aggravated robbery. Based on the contention that his aggravated robbery conviction should be reversed, Littlejohn also argues that his felony-murder and aggravated kidnapping convictions should also be reversed because the aggravated robbery charge served as an element for both the felony-murder and aggravated kidnapping charges.

Like the felony-murder statute, the aggravated robbery statute contains absolutely no language to suggest that taking individual pieces of property from the person or presence of a victim establish alternative means of committing an aggravated robbery. With regard to Littlejohn's multiple acts argument, there is no analysis within Littlejohn's brief addressing whether the taking of the three pieces of property from Collins should be considered unitary conduct or separate and distinct acts. See *State v. Colston*, 290 Kan. 952, 962, 235 P.3d 1234 (2010) (identifying factors for determining whether the acts at issue occurred during a single course of conduct or whether the acts are separate and distinct from each other). Again, an issue not briefed by the appellant is deemed waived and abandoned. *Holman*, 295 Kan. at 125.

Regardless, the evidence presented at trial indicates that the three pieces of property were taken from Collins during a single course of conduct—the takings occurred at or near the same time; the takings occurred at the same location; there were no intervening events between the takings; and there is no evidence to suggest

that different impulses motivated the individual takings. The aggravated robbery charge was not supported by multiple acts requiring a unanimity instruction. See *Colston*, 290 Kan. at 962.

Finally, prior to oral arguments, Littlejohn filed a letter of additional authority pursuant to Supreme Court Rule 6.09(b) (2013 Kan. Ct. R. Annot. 50), arguing that his aggravated robbery conviction was based on the alternative means of taking property by force or by threat of bodily harm to Collins and that insufficient evidence was presented at trial showing that property was taken from Collins by threat of bodily harm.

Littlejohn did not raise this specific argument in his brief. Rule 6.09(b) letters are reserved for citing significant relevant authorities not previously cited which come to a party's attention after briefing. This court has previously held that an appellate court will not consider new issues raised for the first time in a party's Rule 6.09(b) letter. See, *e.g.*, *State v. Tague*, 296 Kan. 993, 1010-11, 298 P.3d 273 (2013); *State v. Houston*, 289 Kan. 252, Syl. ¶ 13, 213 P.3d 728 (2009) ("[Rule 6.09] was not intended to be, nor should it be, used as yet another briefing opportunity.").

Littlejohn has failed to show that any of his convictions should be reversed due to insufficient evidence.

## CUMULATIVE ERROR

Littlejohn asserts that even if the issues that he has raised do not rise to the level of reversible error individually, the cumulative effect of these errors operated to deny him a fair trial, requiring reversal of his convictions.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. If the evidence is overwhelming against the defendant, however, no prejudicial error may be found based upon this cumulative error rule. *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011). Furthermore, a single error cannot constitute cumulative error. *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012).

As shown from the facts stated above, the State presented overwhelming evidence establishing Littlejohn's culpability for each crime he was found guilty of committing. Furthermore, in our analysis of all the issues that Littlejohn raised on appeal, we only found one that may have constituted error, though not reversible error: the failure to instruct the jury on second-degree intentional murder. This one possible error cannot constitute cumulative error. Littlejohn's cumulative error argument is without merit.

Affirmed.